## SMITH *v.* MURRAY, DIRECTOR, VIRGINIA DEPARTMENT OF CORRECTIONS

No. 85–5487.  Argued March 4, 1986—Decided June 26, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *ante*, p. 516. STEVENS, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, and in Parts II and III of which BRENNAN, J., joined, *post*, p. 539.

*J. Lloyd Snook III*, by appointment of the Court, 474 U. S. 993, argued the cause for petitioner. With him on the briefs was *Richard J. Bonnie.*

*James E. Kulp*, Senior Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief were *William G. Broaddus*, Attorney General, and *Frank S. Ferguson*, Assistant Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

We granted certiorari to decide whether and, if so, under what circumstances, a prosecutor may elicit testimony from a mental health professional concerning the content of an interview conducted to explore the possibility of presenting psychiatric defenses at trial. We also agreed to review the

*Briefs of *amici curiae* urging reversal were filed for the American Psychiatric Association et al. by *Joel I. Klein, Joseph N. Onek*, and *Peter E. Scheer;* for the American Psychological Association by *Bruce J. Ennis, Jr.*, and *Donald N. Bersoff;* and for the New Jersey Department of the Public Advocate by *Linda G. Rosenzweig.*

Court of Appeals' determination that any error in the admission of the psychiatrist's evidence in this case was irrelevant under the holding of *Zant* v. *Stephens*, 462 U. S. 862 (1983). On examination, however, we conclude that petitioner defaulted his underlying constitutional claim by failing to press it before the Supreme Court of Virginia on direct appeal. Accordingly, we decline to address the merits of petitioner's claims and affirm the judgment dismissing the petition for a writ of habeas corpus.

## I

Following a jury trial, petitioner was convicted of the May 1977 murder of Audrey Weiler. According to his confession, petitioner encountered Ms. Weiler in a secluded area near his home and raped her at knifepoint. Fearing that her testimony could send him back to prison, he then grabbed her by the neck and choked her until she fell unconscious. When he realized that she was still alive, he dragged her into a nearby river, submerged her head, and repeatedly stabbed her with his knife. A subsequent medical examination indicated that the death was attributable to three clusters of lethal injuries: asphyxia from strangulation, drowning, and multiple stab wounds.

Prior to the trial, petitioner's appointed counsel, David Pugh, had explored the possibility of presenting a number of psychiatric defenses. Towards that end, Mr. Pugh requested that the trial court appoint a private psychiatrist, Dr. Wendell Pile, to conduct an examination of petitioner. Aware that psychiatric reports were routinely forwarded to the court and that such reports were then admissible under Virginia law, Mr. Pugh had advised petitioner not to discuss any prior criminal episodes with anyone. App. 134. See *Gibson* v. *Commonwealth*, 216 Va. 412, 219 S. E. 2d 845 (1975). Although that general advice was intended to apply to the forthcoming psychiatric examination, Mr. Pugh later testified that he "did not specifically tell [petitioner] not to say anything to Doctor Pile about the offense or any of-

fenses." App. 132. During the course of the examination, Dr. Pile did in fact ask petitioner both about the murder and about prior incidents of deviant sexual conduct. Tr. of State Habeas Hearing 19. Although petitioner initially declined to answer, he later stated that he had once torn the clothes off a girl on a school bus before deciding not to carry out his original plan to rape her. App. 44. That information, together with a tentative diagnosis of "Sociopathic Personality; Sexual Deviation (rape)," was forwarded to the trial court, with copies sent both to Mr. Pugh and to the prosecutor who was trying the case for the Commonwealth. *Id.*, at 43–45. At no point prior to or during the interview did Dr. Pile inform petitioner that his statements might later be used against him or that he had the right to remain silent and to have counsel present if he so desired. *Id.*, at 90. Cf. *Estelle* v. *Smith*, 451 U. S. 454 (1981).

At the sentencing phase of the trial, the Commonwealth called Dr. Pile to the stand. Over the defense's objection, Dr. Pile described the incident on the school bus. Tr. 934–935. On cross-examination, he repeated his earlier conclusion that petitioner was a "sociopathic personality." *Id.*, at 936. After examining a second psychiatrist, the Commonwealth introduced petitioner's criminal record into evidence. It revealed that he had been convicted of rape in 1973 and had been paroled from the penitentiary on that charge less than four months prior to raping and murdering Ms. Weiler. The defense then called 14 character witnesses, who testified that petitioner had been a regular churchgoer, a member of the choir, a conscientious student in high school, and a good soldier in Vietnam. After lengthy deliberation, the jury recommended that petitioner be sentenced to death.

Petitioner appealed his conviction and sentence to the Supreme Court of Virginia. In his brief he raised 13 separate claims, including a broad challenge to the constitutionality of Virginia's death penalty provisions, objections to several of the trial court's evidentiary rulings, and a challenge to

the exclusion of a prospective juror during *voir dire*. Petitioner did not, however, assign any error concerning the admission of Dr. Pile's testimony. At a subsequent state postconviction hearing, Mr. Pugh explained that he had consciously decided not to pursue that claim after determining that "Virginia case law would [not] support our position at that particular time." App. 143. Various objections to the Commonwealth's use of Dr. Pile's testimony were raised, however, in a brief filed by *amicus curiae* Post-Conviction Assistance Project of the University of Virginia Law School.

The Supreme Court of Virginia affirmed the conviction and sentence in all respects. *Smith* v. *Commonwealth*, 219 Va. 455, 248 S. E. 2d 135 (1978). In a footnote, it noted that, pursuant to a rule of the court, it had considered only those arguments advanced by *amicus* that concerned errors specifically assigned by the defendant himself. *Id.*, at 460, n. 1, 248 S. E. 2d, at 139, n. 1. Accordingly, it did not address any issues concerning the prosecution's use of the psychiatric testimony. This Court denied the subsequent petition for certiorari, which, again, did not urge the claim that admission of Dr. Pile's testimony violated petitioner's rights under the Federal Constitution. 441 U. S. 967 (1979).

In 1979, petitioner sought a writ of habeas corpus in the Circuit Court for the City of Williamsburg and the County of James City. For the first time since the trial, he argued that the admission of Dr. Pile's testimony violated his privilege against self-incrimination under the Fifth and Fourteenth Amendments to the Federal Constitution. The court ruled, however, that petitioner had forfeited the claim by failing to press it in earlier proceedings. At a subsequent evidentiary hearing, conducted solely on the issue of ineffective assistance of counsel, the court heard testimony concerning the reasons underlying Mr. Pugh's decision not to pursue the Fifth Amendment claim on appeal. On the basis of that testimony, the court found that Pugh and his assistant had researched the question, but had determined that the claim was

unlikely to succeed. Thus, the court found, "counsel exercised reasonable judgment in deciding not to preserve the objection on appeal, and . . . this decision resulted from informed, professional deliberation." App. to Pet. for Cert. 71. Petitioner appealed the denial of his habeas petition to the Supreme Court of Virginia, contending that the Circuit Court had erred in finding that his objection to the admission of Dr. Pile's testimony had been defaulted. The Supreme Court declined to accept the appeal, *Smith* v. *Morris*, 221 Va. cxliii (1981), and we again denied certiorari. 454 U. S. 1128 (1981).

Having exhausted state remedies, petitioner sought a writ of habeas corpus in the United States District Court for the Eastern District of Virginia. In an unpublished order, the court denied the petition, holding that the objection to the admission of Dr. Pile's testimony was "clearly barred" under this Court's decision in *Wainwright* v. *Sykes*, 433 U. S. 72 (1977). App. 158. In reaching that conclusion, the District Judge noted that "the default resulted not from the trial attorney's ignorance or inadvertence, but because of a deliberate tactical decision." *Ibid.*

The Court of Appeals for the Fourth Circuit affirmed, but on different grounds. *Smith* v. *Procunier*, 769 F. 2d 170 (1985). Finding it unnecessary to rely on procedural default or to address the merits of the substantive constitutional claim, the court held that admission of Dr. Pile's testimony, even if erroneous, could not be the basis for invalidating petitioner's sentence. It noted that the jury had relied on two distinct aggravating factors in its decision to recommend the death penalty. The psychiatric testimony, however, only bore on one of those factors, the likelihood that petitioner would "constitute a continuing serious threat to society." Va. Code § 19.2–264.2 (1983); Tr. 1102. In that circumstance, the Court of Appeals believed, our decision in *Zant* v. *Stephens*, 462 U. S., at 884, required the conclusion that the error, if any, was irrelevant to the overall validity of the sen-

tence. We granted certiorari, *Smith* v. *Sielaff,* 474 U. S. 918 (1985), and now affirm on the authority of our decision in *Murray* v. *Carrier, ante,* p. 478.

## II

Under Virginia law, failure to raise a claim on direct appeal from a criminal conviction ordinarily bars consideration of that claim in any subsequent state proceeding. See, *e. g., Coppola* v. *Warden of Virginia State Penitentiary,* 222 Va. 369, 282 S. E. 2d 10 (1981); *Slayton* v. *Parrigan,* 215 Va. 27, 205 S. E. 2d 680 (1974). In the present case, the Virginia courts have enforced that rule by declining to consider petitioner's objection to the admission of Dr. Pile's testimony, a claim concededly not included in his initial appeal from his conviction and sentence. Consistent with our earlier intimations in *Reed* v. *Ross,* 468 U. S. 1, 11 (1984), we held in *Murray* v. *Carrier, ante,* p. 478, that a federal habeas court must evaluate appellate defaults under the same standards that apply when a defendant fails to preserve a claim at trial. Accordingly, although federal courts at all times retain the power to look beyond state procedural forfeitures, the exercise of that power ordinarily is inappropriate unless the defendant succeeds in showing both "cause" for noncompliance with the state rule and "actual prejudice resulting from the alleged constitutional violation." *Wainwright* v. *Sykes, supra,* at 84; *Murray* v. *Carrier, ante,* at 485. As we explained more fully in *Carrier,* this congruence between the standards for appellate and trial default reflects our judgment that concerns for finality and comity are virtually identical regardless of the timing of the defendant's failure to comply with legitimate state rules of procedure.

We need not determine whether petitioner has carried his burden of showing actual prejudice from the allegedly improper admission of Dr. Pile's testimony, for we think it self-evident that he has failed to demonstrate cause for his non-compliance with Virginia's procedures. We have declined in

the past to essay a comprehensive catalog of the circumstances that would justify a finding of cause. *Reed* v. *Ross, supra,* at 13; see also *Wainwright* v. *Sykes, supra,* at 91. Our cases, however, leave no doubt that a deliberate, tactical decision not to pursue a particular claim is the very antithesis of the kind of circumstance that would warrant excusing a defendant's failure to adhere to a State's legitimate rules for the fair and orderly disposition of its criminal cases. As the Court explained in *Reed:*

> "[D]efense counsel may not make a tactical decision to forgo a procedural opportunity—for instance, to object at trial or to raise an issue on appeal—and then when he discovers that the tactic has been unsuccessful, pursue an alternative strategy in federal court. The encouragement of such conduct by a federal court on habeas corpus review would not only offend generally accepted principles of comity, but would undermine the accuracy and efficiency of the state judicial systems to the detriment of all concerned. Procedural defaults of this nature are, therefore, inexcusable, and cannot qualify as 'cause' for purposes of federal habeas corpus review." 468 U. S., at 14 (internal quotation and citation omitted).

Here the record unambiguously reveals that petitioner's counsel objected to the admission of Dr. Pile's testimony at trial and then consciously elected not to pursue that claim before the Supreme Court of Virginia. The basis for that decision was counsel's perception that the claim had little chance of success in the Virginia courts. With the benefit of hindsight, petitioner's counsel in this Court now contends that this perception proved to be incorrect. Cf. *Gibson* v. *Zahradnick,* 581 F. 2d 75 (CA4 1978) (repudiating reasoning of *Gibson* v. *Commonwealth,* 216 Va. 412, 219 S. E. 2d 845 (1975)). Even assuming that to be the case, however, a State's subsequent acceptance of an argument deliberately abandoned on direct appeal is irrelevant to the question whether the default should be excused on federal habeas.

Indeed, it is the very prospect that a state court "may decide, upon reflection, that the contention is valid" that undergirds the established rule that "perceived futility alone cannot constitute cause," *Engle* v. *Isaac*, 456 U. S. 107, 130, and n. 36 (1982); for "[a]llowing criminal defendants to deprive the state courts of [the] opportunity" to reconsider previously rejected constitutional claims is fundamentally at odds with the principles of comity that animate *Sykes* and its progeny. *Id.*, at 130.

Notwithstanding the deliberate nature of the decision not to pursue his objection to Dr. Pile's testimony on appeal—a course of conduct virtually dispositive of any effort to satisfy *Syke*'s "cause" requirement—petitioner contends that the default should be excused because Mr. Pugh's decision, though deliberate, was made in ignorance. Had he investigated the claim more fully, petitioner maintains, "it is inconceivable that he would have concluded that the claim was without merit or that he would have failed to raise it." Reply Brief for Petitioner 3.

The argument is squarely foreclosed by our decision in *Carrier*, which holds that "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Ante*, at 486–487. See also *Engle* v. *Isaac*, *supra*, at 133–134. Nor can it seriously be maintained that the decision not to press the claim on appeal was an error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of *Strickland* v. *Washington*, 466 U. S. 668 (1984). *Carrier* reaffirmed that "the right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error . . . if that error is sufficiently egregious and prejudicial." *Ante*, at 496; see also *United States* v. *Cronic*, 466 U. S. 648, 657, n. 20 (1984). But counsel's deliberate decision not to pursue his objection to the admission of Dr. Pile's testimony falls far short of meeting that rigorous standard. After con-

ducting a vigorous defense at both the guilt and sentencing phases of the trial, counsel surveyed the extensive transcript, researched a number of claims, and decided that, under the current state of the law, 13 were worth pursuing on direct appeal. This process of "winnowing out weaker arguments on appeal and focusing on" those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy. *Jones* v. *Barnes*, 463 U. S. 745, 751–752 (1983). It will often be the case that even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding or will underestimate the likelihood that a federal habeas court will repudiate an established state rule. But, as *Strickland* v. *Washington* made clear, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U. S., at 689. Viewed in light of Virginia law at the time Mr. Pugh submitted his opening brief to the Supreme Court of Virginia, the decision not to pursue his objection to the admission of Dr. Pile's testimony fell well within the "wide range of professionally competent assistance" required under the Sixth Amendment to the Federal Constitution. *Id.*, at 690.

Nor can petitioner rely on the novelty of his legal claim as "cause" for noncompliance with Virginia's rules. See *Reed* v. *Ross*, 468 U. S., at 18 ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures"). Petitioner contends that this Court's decisions in *Estelle* v. *Smith*, 451 U. S. 454 (1981), and *Ake* v. *Oklahoma*, 470 U. S. 68 (1985), which were decided well after the affirmance of his conviction and sentence on direct appeal, lend support to his position that Dr. Pile's testimony should have been excluded.

But, as a comparison of *Reed* and *Engle* makes plain, the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was "available" at all. As petitioner has candidly conceded, various forms of the claim he now advances had been percolating in the lower courts for years at the time of his original appeal. Brief for Petitioner 20–21, n. 12; Reply Brief for Petitioner 3. Moreover, in this very case, an *amicus* before the Supreme Court of Virginia specifically argued that admission of Dr. Pile's testimony violated petitioner's rights under the Fifth and Sixth Amendments. Brief for Post-Conviction Assistance Project of the University of Virginia Law School as *Amicus Curiae* in No. 780293, pp. 53–62. Under these circumstances, it simply is not open to argument that the legal basis of the claim petitioner now presses on federal habeas was unavailable to counsel at the time of the direct appeal.

We conclude, therefore, that petitioner has not carried his burden of showing cause for noncompliance with Virginia's rules of procedure. That determination, however, does not end our inquiry. As we noted in *Engle* and reaffirmed in *Carrier*, "'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray* v. *Carrier, ante,* at 495, quoting *Engle* v. *Isaac, supra,* at 135. Accordingly, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray* v. *Carrier, ante,* at 496.

We acknowledge that the concept of "actual," as distinct from "legal," innocence does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense. Nonetheless, we think it clear on this record that application of the cause and prejudice test will not result

in a "fundamental miscarriage of justice." *Engle,* 456 U. S., at 135. There is no allegation that the testimony about the school bus incident was false or in any way misleading. Nor can it be argued that the prospect that Dr. Pile might later testify against him had the effect of foreclosing meaningful exploration of psychiatric defenses. While that concern is a very real one in the abstract, here the record clearly shows that Dr. Pile did ask petitioner to discuss the crime he stood accused of committing as well as prior incidents of deviant sexual conduct. Although initially reluctant to do so, ultimately petitioner was forthcoming on both subjects. In short, the alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones. Thus, even assuming that, as a legal matter, Dr. Pile's testimony should not have been presented to the jury, its admission did not serve to pervert the jury's deliberations concerning the ultimate question whether *in fact* petitioner constituted a continuing threat to society. Under these circumstances, we do not believe that refusal to consider the defaulted claim on federal habeas carries with it the risk of a manifest miscarriage of justice.

Nor can we concur in JUSTICE STEVENS' suggestion that we displace established procedural default principles with an amorphous "fundamental fairness" inquiry. *Post,* at 542–543. Precisely which parts of the Constitution are "fundamental" and which are not is left for future elaboration. But, for JUSTICE STEVENS, when a defendant in a capital case raises a "substantial, colorable" constitutional claim, a federal court should entertain it no matter how egregious the violation of state procedural rules, and regardless of the fairness of the opportunity to raise that claim in the course of his trial and appeal. *Post,* at 546. We reject the suggestion that the principles of *Wainwright* v. *Sykes* apply differently depending on the nature of the penalty a State imposes for the violation of its criminal laws. We similarly reject the suggestion that there is anything "fundamentally unfair"

about enforcing procedural default rules in cases devoid of any substantial claim that the alleged error undermined the accuracy of the guilt or sentencing determination. In view of the profound societal costs that attend the exercise of habeas jurisdiction, such exercise "carries a serious burden of justification." H. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 146 (1970); see also *Engle* v. *Isaac, supra,* at 126–129. When the alleged error is unrelated to innocence, and when the defendant was represented by competent counsel, had a full and fair opportunity to press his claim in the state system, and yet failed to do so in violation of a legitimate rule of procedure, that burden has not been carried.

Accordingly, we affirm the judgment of the Court of Appeals upholding the dismissal of petitioner's application for a writ of habeas corpus.

*Affirmed.*

[For dissenting opinion of JUSTICE BRENNAN, see *ante,* p. 516.]

JUSTICE STEVENS, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join and with whom JUSTICE BRENNAN joins as to Parts II and III, dissenting.

The record in this case unquestionably demonstrates that petitioner's constitutional claim is meritorious, and that there is a significant risk that he will be put to death *because* his constitutional rights were violated.

The Court does not take issue with this conclusion. It is willing to assume that (1) petitioner's Fifth Amendment right against compelled self-incrimination was violated; (2) his Eighth Amendment right to a fair, constitutionally sound sentencing proceeding was violated by the introduction of the evidence from that Fifth Amendment violation; and (3) those constitutional violations made the difference between life and death in the jury's consideration of his fate. Although the constitutional violations and issues were sufficiently serious

that this Court decided to grant certiorari, and although the Court of Appeals for the Fourth Circuit decided the issue on the merits, this Court concludes that petitioner's presumably meritorious constitutional claim is procedurally barred and that petitioner must therefore be executed.

In my opinion, the Court should reach the merits of petitioner's argument. To the extent that there has been a procedural "default," it is exceedingly minor—perhaps a kind of "harmless" error. Petitioner's counsel raised a timely objection to the introduction of the evidence obtained in violation of the Fifth Amendment. A respected friend of the Court—the University of Virginia Law School's Post-Conviction Assistance Project—brought the issue to the attention of the Virginia Supreme Court in an extensive *amicus curiae* brief. Smith's counsel also raised the issue in state and federal habeas corpus proceedings, and, as noted, the Court of Appeals decided the case on the merits. Consistent with the well-established principle that appellate arguments should be carefully winnowed,[1] however, Smith's counsel did not raise the Fifth Amendment issue in his original appeal to the Virginia Supreme Court—an unsurprising decision in view of the fact that a governing Virginia Supreme Court precedent, which was then entirely valid and only two years old, decisively barred the claim.[2]

Nevertheless, the Court finds the lawyer's decision not to include the constitutional claim "virtually dispositive." *Ante*, at 535. The Court offers the remarkable explanation that "[u]nder these circumstances"—in which petitioner's death penalty will stand despite serious Fifth and Eighth Amendment violations that played a critical role in the determination that death is an appropriate penalty—"we do not believe that refusal to consider the defaulted claim on federal

---

[1] See *Jones* v. *Barnes*, 463 U. S. 745, 751–752 (1983); *ante*, at 536.

[2] See *Gibson* v. *Commonwealth*, 216 Va. 412, 219 S. E. 2d 845 (1975), cert. denied, 425 U. S. 994 (1976).

habeas carries with it the risk of a manifest miscarriage of justice." *Ante,* at 538.

I fear that the Court has lost its way in a procedural maze of its own creation and that it has grossly misevaluated the requirements of "law and justice" that are the federal court's statutory mission under the federal habeas corpus statute.[3] To understand the nature of the Court's error, it is necessary to assess the Court's conclusion that the claim is procedurally defaulted; to consider the Fifth Amendment violation; and to consider the Eighth Amendment violation.

I

We begin with the common ground. The historic office of the Great Writ as the ultimate protection against fundamental unfairness is well known.[4] That mission is reflected in the statutory requirement that the federal court "dispose of the matter as law and justice require." 28 U. S. C. § 2243. It is by now equally clear that the application of the Court's "cause and prejudice" formulation as a rigid bar to review of fundamental constitutional violations has no support in the statute, or in Federal Rule of Criminal Procedure 12 (b)(2), from which it was initially imported;[5] the standard thus represents judicial lawmaking of the most unabashed form. The Court nonetheless reaffirms today, as it has consistently held in the past,[6] that federal courts retain the

---

[3] See 28 U. S. C. § 2243 ("The court shall . . . dispose of the matter as law and justice require").

[4] See, *e. g., Engle* v. *Isaac,* 456 U. S. 107, 126 (1982) ("The writ of habeas corpus indisputably holds an honored position in our jurisprudence. . . . Today, as in prior centuries, the writ is a bulwark against convictions that violate 'fundamental fairness'").

[5] See *Murray* v. *Carrier, ante,* at 501–505 (STEVENS, J., concurring in judgment). Indeed, the Court in *Murray* conceded that "[t]he cause and prejudice test may lack a perfect historical pedigree," *ante,* at 496, and noted that "the Court acknowledged as much in *Wainwright* v. *Sykes." Ibid.*

[6] See, *e. g., Reed* v. *Ross,* 468 U. S. 1, 9 (1984); *Francis* v. *Henderson,* 425 U. S. 536, 538 (1976); *Fay* v. *Noia,* 372 U. S. 391, 398–399 (1963).

*power* to entertain federal habeas corpus requests despite the absence of "cause and prejudice," *ante*, at 537; the only question is whether to exercise that power. Despite the rigor of its cause-and-prejudice standard, moreover, the Court continues to commit itself to maintaining the availability of habeas corpus under certain circumstances, even in the absence of "cause," *ibid.;* indeed, this Term, the Court has emphasized the importance of that availability by remanding a case to consider the merits of a prisoner's claim even though the prisoner failed to show "cause" for the default. *Murray* v. *Carrier, ante,* p. 478.

The Court concludes in this case that no miscarriage of justice will result from a refusal to entertain Smith's challenge to his death sentence. This conclusion is flawed in three respects. First, the Court mistakenly assumes that only a claim implicating "actual innocence" rises to the level of a miscarriage of justice. Second, the Court does not properly assess the force of a claim that a death penalty is invalid. Finally, the Court vastly exaggerates the state interest in refusing to entertain this claim.

The Court accurately quotes the holding in *Murray* v. *Carrier:* " '[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.' " *Ante,* at 537. The Court then seeks to transfer this "actual innocence" standard to capital sentencing proceedings, and concludes that, in petitioner's sentencing hearing, "the alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones." *Ante,* at 538. The Court does not explain, however, why *Carrier*'s clearly correct holding about the propriety of the writ in a case of innocence must also be a *limiting* principle on the federal court's ability to exercise its statutory authority to entertain federal habeas corpus actions; more specifically, the Court

does not explain why the same principle should not apply when a constitutional violation is claimed to have resulted in a lack of fundamental fairness, either in a conviction or in a death sentence.

This analysis is far removed from the traditional understanding of habeas corpus. For instance, in *Moore* v. *Dempsey*, 261 U. S. 86 (1923), the Court considered a claim that the murder convictions and death sentences of five black defendants were unconstitutional. The Federal District Court had dismissed the writ of habeas corpus. In his opinion for the Court, Justice Holmes explained that in view of the allegations—systematic exclusion of blacks from the jury and threatened mob violence—the Federal District Court should not have dismissed the writ without considering the factual allegations. The Court noted the presence of a clear procedural default—the Arkansas Supreme Court had refused to entertain the challenge to discrimination in the jury because the objection "came too late." *Id.*, at 91. The Court nevertheless held that the Federal District Court should have entertained the petition. *Id.*, at 92.

Although the allegations clearly implicated questions about the accuracy of the truth-finding process, the Court's opinion cannot be fairly read to rest on the kind of "innocence" inquiry that the Court propounds today. For the Court specifically rejected the notion that its inquiry into the presence of a serious constitutional violation was actually an inquiry into the guilt or innocence of the petitioners: "The petitioners say that [the victim] must have been killed by other whites [rather than by the black petitioners], but that we leave on one side *as what we have to deal with is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved.*" *Id.*, at 87–88 (emphasis added). Today, the Court adopts the converse of Justice Holmes' proposition: it leaves to one side the question

whether constitutional rights have been preserved, and considers only petitioner's innocence or guilt.[7]

The majority's reformulation of the traditional understanding of habeas corpus appears to be premised on the notion that only constitutional violations which go to guilt or innocence are sufficiently serious to implicate the "fundamental fairness" alluded to in *Engle* v. *Isaac*, 456 U. S. 107, 126 (1982).[8]   If accuracy in the determination of guilt or innocence were the only value of our criminal justice system, then the Court's analysis might have a great deal of force.   If accuracy is the only value, however, then many of our constitutional protections—such as the Fifth Amendment right against compelled self-incrimination and the Eighth Amendment right against cruel and unusual punishment, the very claims asserted by petitioner—are not only irrelevant, but possibly counterproductive.[9]   Our Constitution, however, and

---

[7] In doing so, the Court goes a long way toward eliminating the distinction, in procedural default cases, between the request for habeas relief and the ultimate issue for a trial court—a distinction that has long been central to our understanding of the Great Writ.   See, *e. g., Ex parte Bollman*, 4 Cranch 75, 101 (1807) (Marshall, C. J.) ("It has been demonstrated at the bar, that the question brought forward on a *habeas corpus*, is always distinct from that which is involved in the cause itself.   The question whether the individual shall be imprisoned is always distinct from the question whether he shall be convicted or acquitted of the charge on which he is to be tried, and therefore these questions are separated, and may be decided in different courts").

[8] See n. 4, *supra*.

[9] Expressing this view, William Howard Taft once observed that, precisely because of the central value of accuracy in guilt or innocence determinations, the Fifth Amendment might have been ill advised.   See Taft, The Administration of Criminal Law, 15 Yale L. J. 1, 8 (1905) ("When examined as an original proposition, the prohibition that the defendant in a criminal case shall not be compelled to testify seems, in some aspects, to be of doubtful utility.   If the administration of criminal law is for the purpose of convicting those who are guilty of crime, then it seems natural to follow in such a process the methods that obtain in ordinary life").

our decision to adopt an "accusatorial," rather than an "inquisitorial" system of justice,[10] reflect a different choice. That choice is to afford the individual certain protections — the right against compelled self-incrimination and the right against cruel and unusual punishment among them—even if those rights do not necessarily implicate the accuracy of the truth-finding proceedings. Rather, those protections are an aspect of the fundamental fairness, liberty, and individual dignity that our society affords to all, even those charged with heinous crimes.

In my opinion, then, the Court's exaltation of accuracy as the only characteristic of "fundamental fairness" is deeply flawed. Our criminal justice system, and our Constitution, protect other values in addition to the reliability of the guilt or innocence determination, and the statutory duty to serve "law and justice" should similarly reflect those values.

Thus, the Court begins with a conception of "fundamental fairness" that is far too narrow and that conflicts with the nature of our criminal justice system. The Court similarly fails to give appropriate weight to the fact that capital punishment is at stake in this case. It is now well settled that "death is a different kind of punishment from any other which may be imposed in this country." *Gardner* v. *Florida*, 430 U. S. 349, 357 (1977) (STEVENS, J.).[11] It is of vital importance to

---

[10] See *Moran* v. *Burbine*, 475 U. S. 412, 434, and n. 1 (1986) (STEVENS, J., dissenting); *Miller* v. *Fenton*, 474 U. S. 104, 110 (1985); *Malloy* v. *Hogan*, 378 U. S. 1, 7–8 (1964); *Rogers* v. *Richmond*, 365 U. S. 534, 540–541 (1961); *Bram* v. *United States*, 168 U. S. 532, 543–545 (1897).

[11] See also *California* v. *Ramos*, 463 U. S. 992, 998–999 (1983) ("The Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *Zant* v. *Stephens*, 462 U. S. 862, 884 (1983) ("[T]here is a qualitative difference between death and any other permissible form of punishment"); *Rummel* v. *Estelle*, 445 U. S. 263, 272 (1980) ("This theme, the unique nature of the death penalty for purposes

the defendant and to the community that any decision to impose the death sentence be, and appear to be, the consequence of scrupulously fair procedures. When a condemned prisoner raises a substantial, colorable Eighth Amendment violation, there is a special obligation, consistent with the statutory mission to "dispose of the matter as law and justice require," to consider whether the prisoner's claim would render his sentencing proceeding fundamentally unfair. Indeed, it was precisely this concern that prompted the Court of Appeals to consider petitioner's argument on the merits: "[W]e give weight to the consideration that we have before us a matter of life and death. The imminent execution of Smith serves as sufficient grounds to review the issue." *Smith* v. *Procunier*, 769 F. 2d 170, 172 (1985).

Finally, as in every habeas corpus decision, the magnitude of the State's interest must be considered. In this case, sev-

---

of Eighth Amendment analysis, has been repeated time and time again in our opinions. . . . [A] sentence of death differs in kind from any sentence of imprisonment"); *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978) (BURGER, C. J.) ("[T]he imposition of death by public authority is . . . profoundly different from all other penalties"). Cf. Meltzer, State Court Forfeitures of Federal Rights, 99 Harv. L. Rev. 1128, 1222 (1986) ("[W]hen a capital defendant raises a nonfrivolous constitutional question, neither state nor federal courts should be free to refuse to decide it simply because it was not raised in accordance with state procedural requirements. Rather, federal law should expressly provide that in matters of procedural default, as in other matters, death is different").

Indeed, the Court has recognized that even the *threat* of a death penalty may, in certain circumstances, exert a special pull in favor of the exercise of the federal court's undisputed statutory power to entertain a habeas corpus writ on a claim that was procedurally defaulted. In *Fay* v. *Noia*, 372 U. S., at 440, the Court was willing to excuse Noia's deliberate decision not to appeal because Noia perceived that a death sentence might result: "His was the grisly choice whether to sit content with life imprisonment or to travel the uncertain avenue of appeal which, if successful, might well have led to a retrial and death sentence." See also *Wainwright* v. *Sykes*, 433 U. S. 72, 83 (1977) (emphasizing Noia's " 'grisly choice' between acceptance of his life sentence and pursuit of an appeal which might culminate in a sentence of death").

eral factors suggest that the State's interest is not adequate to obstruct federal habeas corpus consideration of petitioner's claim. First, petitioner made a timely objection at trial, and the state interest in enforcing procedural default rules at trial is far greater than the State's interest in enforcing procedural default rules on appeal.[12] Second, the issue was raised before the state court in an *amicus curiae* brief.[13] Since this is a matter on which courts ordinarily may exercise discretion,[14] the discretionary decision not to address the issue hardly rises to a state interest of sufficient magnitude that a man should die even though his Fifth and Eighth Amendment rights were violated to achieve that objective. Third, the issue was presented to the state courts in state habeas proceedings—*after* the precedent blocking petitioner's claim had been repudiated[15]—and the state habeas court, while finding that the decision by Smith's counsel not to raise the issue with a governing Virginia precedent squarely against

---

[12] See *Murray* v. *Carrier, ante,* at 506–515 (STEVENS, J., concurring in judgment); Meltzer, *supra,* at 1223–1225; Note, Procedural Defaults at the Appellate Stage and Federal Habeas Corpus Review, 38 Stan. L. Rev. 463 (1986).

[13] See Brief for Post-Conviction Assistance Project of the University of Virginia Law School as *Amicus Curiae* in No. 780293, pp. 56–61 (arguing that the Fifth Amendment required suppression of psychiatrist's testimony).

[14] Cf. *Mapp* v. *Ohio,* 367 U. S. 643, 646, n. 3 (1961) (addressing issue raised by *amicus*); *Schwinden* v. *Burlington Northern, Inc.,* —— Mont. ——, ——, 691 P. 2d 1351, 1358 (1984) ("We determine here not to follow the usual rule that issues raised by amici that are part of the underlying action will not be considered by this Court").

[15] See *Gibson* v. *Zahradnick,* 581 F. 2d 75 (CA4) (holding that the *Gibson* v. *Commonwealth* analysis violates Constitution and that writ of habeas corpus should issue), cert. denied, 439 U. S. 996 (1978). In fact, although the Court of Appeals for the Fourth Circuit decided *Gibson* after the briefs in petitioner's case had been filed, the *Gibson* opinion was issued *before* the initial Virginia Supreme Court opinion refusing to address the issue.

him was entirely reasonable,[16] concluded that the Fifth Amendment claim was procedurally barred and thus did not address it.[17] Fourth, the Court of Appeals for the Fourth Circuit addressed the merits and did not rest on any notion of procedural default; this Court customarily defers to federal courts of appeals on questions of state law,[18] including questions about "cause" for failure to comply with state procedural rules.[19] Finally, and most importantly, the inadequacy of the state interest in this death penalty context is decisively shown by the prevailing practice in many States that appellate courts have a special duty in capital cases to overlook procedural defaults and review the trial record for reversible error, before affirming that most severe of all sentences.[20]

---

[16] See state habeas opinion, App. 147 ("[B]oth *Gibson* v. *Zahradnick* and *Smith* v. *Estelle* were decided after petitioner's trial. Thus, regardless of their usefulness in theory to sustain an appeal, neither was in fact available to counsel when needed. . . . In light of these facts and of the differences noted above, I find sufficient reason for counsel not to have raised on appeal the arguments presented here. I thus conclude that counsel exercised reasonable judgment in deciding not to preserve the objection on appeal").

[17] State habeas order, Record 204 (Fifth Amendment issue "was waived and forfeited and cannot now be considered").

[18] See, *e. g.*, *Pembaur* v. *Cincinnati*, 475 U. S. 469, 484–485, n. 13 (1986); *Regents of University of Michigan* y. *Ewing*, 474 U. S. 214, 224, n. 10 (1985); *United States* v. *S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U. S. 797, 815, n. 12 (1984); *Bishop* v. *Wood*, 426 U. S. 341, 345–347 (1976); *Propper* v. *Clark*, 337 U. S. 472, 486–487 (1949).

[19] See *Jenkins* v. *Anderson*, 447 U. S. 231, 234, n. 1 (1980) ("The applicability of the *Sykes* 'cause'-and-'prejudice' test may turn on an interpretation of state law. . . . This Court's resolution of such a state-law question would be aided significantly by views of other federal courts that may possess greater familiarity with [state] law"); *Rummel* v. *Estelle*, 445 U. S., at 267, n. 7 ("Deferring to the Court of Appeals' interpretation of Texas law, we decline to hold that *Wainwright* bars Rummel from presenting his claim").

[20] See, *e. g.*, Ala. Rule App. Proc. 39(k) ("In all cases in which the death penalty has been imposed, . . . the supreme court may notice any plain error or defect in the proceeding under review, whether or not brought to

Thus, the Court is mistaken in its narrow definition of fundamental fairness, in its failure to appreciate the significance of a challenge to a death penalty, and in its exaggeration of

the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner"); Arkansas Rev. Stat. Ann. § 43–2725 (1977) ("[W]here either a sentence for life imprisonment or death [is present], the Supreme Court shall review all errors prejudicial to the rights of the appellant"); *Cave* v. *State*, 476 So. 2d 180, 183, n. 1 (Fla. 1985) (In capital cases, "[w]e will, of course, continue to review every issue presented and to conduct our own review in accordance with Florida Rule of Appellate Procedure 9.140(f)"); Georgia Unified Appeal Rule IV B(2) (In capital cases, "[t]he Supreme Court shall review each of the assertions of error timely raised by the defendant during the proceedings in the trial court regardless of whether or not an assertion of error was presented to the trial court by motion for new trial, and regardless of whether error is enumerated in the Supreme Court"); *State* v. *Osborn*, 102 Idaho 405, 410–411, 631 P. 2d 187, 192–193 (1981) ("Death is clearly a different kind of punishment from any other that [might] be imposed, and [Idaho Code] § 19–2827 mandates that we examine not only the sentence but the procedure followed in imposing that sentence regardless of whether an appeal is even taken. This indicates to us that we may not ignore unchallenged errors. Moreover, the gravity of a sentence of death and the infrequency with which it is imposed outweighs any rationale that might be proposed to justify refusal to consider errors not objected to below"); *People* v. *Holman*, 103 Ill. 2d 133, 176, 469 N. E. 2d 119, 140 (1984) ("Ordinarily, a contention not made in the trial court is waived on appeal. . . . However, because of the qualitative difference between death and other forms of punishment . . . this court has elected to address errors in death penalty cases which might have affected the decision of the sentencing jury"), cert. denied, 469 U. S. 1220 (1985); *Lowery* v. *State*, 478 N. E. 2d 1214, 1229 (Ind. 1985) ("The failure to properly raise issues in the Motion to Correct Errors generally results in a waiver of the claimed errors. . . . Since the death penalty was imposed in this case, however, we will review the state of the record concerning these questions"); *Ice* v. *Commonwealth*, 667 S. W. 2d 671, 674 (Ky. 1984) ("[I]n a death penalty case every prejudicial error must be considered, whether or not an objection was made in the trial court"), cert. denied, 469 U. S. 860 (1984); *State* v. *Hamilton*, 478 So. 2d 123, 127, n. 7 (La. 1985) ("In death penalty cases, this court has reviewed assignments of error, despite the absence of a contemporaneous objection, in order to determine whether the error 'render[ed] the result unreliable,'

the State's interest in refusing to entertain a claim that was raised at trial, on appeal by an *amicus*, and in state habeas proceedings; that was addressed on the merits by the Court of Appeals (and briefed and argued on the merits in this Court); and that must be assumed to make the difference between life and death. Because I disagree with the Court's evaluation of these matters, I would address the merits of petitioner's argument that constitutional violations render his sentence of death fundamentally unfair.

---

thus avoiding later consideration of the error in the context of ineffective assistance of counsel"); *State* v. *Nave*, 694 S. W. 2d 729, 735 (Mo. 1985) ("Several states hold that the general rule that allegations of court error not assigned in a motion for new trial are not preserved for appellate review, codified in Missouri Rule 29.11(d) with exceptions not applicable here, is inapplicable in death penalty cases. Even though the assignment of error has been improperly preserved, we review, ex gratia, the point relied on for plain error . . . to determine if manifest injustice or a miscarriage of justice resulted from the denial of Nave's request for continuance"); *Commonwealth* v. *McKenna*, 476 Pa. 428, 440–441, 383 A. 2d 174, 181 (1978) ("Because imposition of the death penalty is irrevocable in its finality, it is imperative that the standards by which that sentence is fixed be constitutionally beyond reproach. . . . The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue—the propriety of allowing the state to conduct an illegal execution"); *State* v. *Patterson*, 278 S. C. 319, 320–321, 295 S. E. 2d 264, 264–265 (1982) ("On appeal from a murder conviction in which the death penalty is imposed, this Court reviews the entire record for prejudicial error *in favorem vitae*, regardless of whether the error was properly preserved for review"); *State* v. *Brown*, 607 P. 2d 261, 265 (Utah 1980) ("[N]o objection was made to the omission. Nevertheless, as this is a capital case, we consider the defendant's contention on appeal").

Indeed, Virginia law itself recognizes the special obligations attendant on reviewing death penalties by providing for automatic Virginia Supreme Court review of the death penalty, Va. Code § 17–110.1A (1982), and giving capital cases priority on the court's docket, § 17–110.2. Some State Supreme Courts interpret such statutes to impose an obligation on the court to review the transcript for all possible errors. See, *e. g.*, *State* v. *Osborn, supra*.

## II

The introduction of petitioner's comments to the court-appointed psychiatrist clearly violated the Fifth Amendment. As the majority points out, psychiatric reports by court-appointed psychiatrists "were routinely forwarded to the court and . . . were then admissible under Virginia law." *Ante,* at 529. However, "[a]t no point prior to or during the interview did Dr. Pile inform petitioner that his statements might later be used against him or that he had the right to remain silent and to have counsel present if he so desired." *Ante,* at 530. Moreover, the court-appointed psychiatrist related petitioner's description of an earlier sexual assault in a letter to the court and to the prosecution, as well as to the defense, and testified about the description, at the State's request, at petitioner's capital sentencing hearing. The State thus relied on Dr. Pile's testimony as evidence of "future dangerousness," one of the two aggravating circumstances found by the jury to justify a sentence of death.[21]

CHIEF JUSTICE BURGER's opinion for the Court in *Estelle* v. *Smith,* 451 U. S. 454 (1981), makes it absolutely clear that the introduction of this evidence by the prosecution at the sentencing stage violated the Fifth Amendment. As THE CHIEF JUSTICE explained, the Fifth Amendment fully applies to a capital sentencing proceeding: "Just as the Fifth Amendment prevents a criminal defendant from being made ' "the deluded instrument of his own conviction," ' *Culombe* v. *Connecticut,* 367 U. S. [568,] 581, quoting 2 W. Hawkins, Pleas

---

[21] See Prosecutor's Closing Argument at Sentencing Phase, App. 30–31 ("Now, as I said, you all, the Court has instructed you that you all may fix his punishment at death, if the Commonwealth proved its case—proved the prior history that he would commit criminal acts of violence that would constitute a continuous serious threat to society. Now, what has the Commonwealth proved? The Commonwealth has proved that prior to the crime you all convicted him of yesterday, that he assaulted a person on the bus. He said he did it. . . . Tore her clothes off, and then decided not to do it").

of the Crown 595 (8th ed. 1824), it protects him as well from being made 'the deluded instrument' of his own execution." *Id.*, at 462. As THE CHIEF JUSTICE also explained, prosecutorial use of evidence from a psychiatric interrogation in a capital sentencing proceeding requires the protections, and warnings, accorded the Fifth Amendment right in other contexts: "Because [the defendant] did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to [the psychiatrist] to establish his future dangerousness." *Id.*, at 468.

Thus, the use of petitioner's statements clearly violated the Fifth Amendment.[22] In view of the majority's willingness to assume that the constitutional violation is present but that the failure to address it does not affect the fundamental fairness of petitioner's sentence, moreover, it is instructive to recall the importance of the Fifth Amendment right at issue. Again, THE CHIEF JUSTICE's opinion in *Estelle* v. *Smith* provides guidance:

> "*Miranda* held that 'the prosecution may not use statements, whether exculpatory or inculpatory stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' . . . The purpose of these admonitions is to combat what the Court saw as 'inherently compelling pressures' at work on the person and to provide him with an awareness of the Fifth Amendment privilege and the consequences of forgoing it, which is the prerequisite for 'an intelligent decision as to its exercise.'

> .        .        .        .        .

---

[22] The state trial court's rejection of petitioner's trial objection to the psychiatrist's testimony stands in sharp contrast to THE CHIEF JUSTICE's *Estelle* analysis: "I don't believe that Doctor Pile has any duty to inform him that anything he may say to him may be used for or against him in a Court of Law, as a police officer does under the Miranda." App. 5.

"The Fifth Amendment privilege is 'as broad as the mischief against which it seeks to guard,' *Counselman* v. *Hitchcock*, 142 U. S. 547, 562 (1892), and the privilege is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will and to suffer no penalty . . . for such silence.' *Malloy* v. *Hogan*, 378 U. S., at 1, 8 (1964)." *Id.*, at 466–468.

Given the historic importance of the Fifth Amendment, and the fact that the violation of this right made a significant difference in the jury's evaluation of petitioner's "future dangerousness" (and consequent death sentence), it is not only proper, but imperative, that the federal courts entertain petitioner's entirely meritorious argument that the introduction of the psychiatrist's testimony at his sentencing hearing violated that fundamental protection.[23]

---

[23] The State argues that petitioner's case is distinguishable from *Estelle* because the defense requested the psychiatric examination. In view of the fact that Dr. Pile related the account to the prosecution and the court, and testified for the prosecution, he was quite clearly an "agent of the State" in the same sense in which the psychiatrist in *Estelle* was an agent of the State. See 451 U. S., at 467 ("When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting").

Petitioner and *amici*, in turn, argue that, because the examination was to assist the defense, an absolute guarantee of confidentiality, rather than *Miranda* warnings, should have been required. They contend that such confidentiality is especially important to effectuate the due process right to consult with a psychiatrist that was recognized in *Ake* v. *Oklahoma*, 470 U. S. 68 (1985). Since, at a minimum, *Estelle* required that Dr. Pile give *Miranda* warnings, we need not consider the possibility that disclosure would have been inappropriate in any circumstances. For it is at least clear that, under *these* circumstances, his testimony violated petitioner's Fifth Amendment right. Moreover, we need not decide whether, under these circumstances, in which the psychiatrist may have actually been act-

## III

It is also quite clear that the introduction of the evidence violated his Eighth Amendment right to a fair sentencing proceeding. In this respect, I disagree with the Court of Appeals' reading of the opinion that I authored for the Court in *Zant* v. *Stephens*, 462 U. S. 862 (1983). The Court of Appeals concluded that, because the jury also found an aggravating circumstance of "vileness," the death sentence could stand even if Dr. Pile's testimony represented a flagrant Fifth Amendment violation.

In *Zant*, we held that the Georgia Supreme Court's invalidation of one of the three aggravating circumstances found by the jury did not require that the death penalty be set aside. But that conclusion was reached only after we satisfied ourselves that the evidence relating to the invalid aggravating circumstance had been properly admitted.[24] We

---

ing as an agent of the defense, his transformation into an agent of the State was itself constitutionally invalid under the Sixth Amendment.

[24] "But the invalid aggravating circumstance found by the jury in this case was struck down in *Arnold* because the Georgia Supreme Court concluded that it fails to provide an adequate basis for distinguishing a murder case in which the death penalty may be imposed from those cases in which such a penalty may not be imposed. See nn. 5 and 16, *supra*. *The underlying evidence is nevertheless fully admissible at the sentencing phase.* . . .

   .        .        .        .

"Thus, any evidence on which the jury might have relied in this case to find that respondent had previously been convicted of a substantial number of serious assaultive offenses, as he concedes he has been, was properly adduced at the sentencing hearing and was fully subject to explanation by the defendant." 462 U. S., at 886–887 (emphasis added).

We continued:

"Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality. We accept that court's view that the subsequent invalidation of one of several statutory aggravating circumstances does not automatically require reversal of the death penalty, having been assured that a death sentence will be set aside if the invalidation of an aggravating circumstance makes the penalty arbitrary and capricious. 250 Ga., at 101,

did not conclude, as the Court of Appeals seems to have assumed, that any evidence concerning the invalid circumstance was simply irrelevant because the valid circumstances were, in all events, sufficient to support the death penalty. The fact that the record adequately establishes one valid aggravating circumstance may make the defendant eligible for the death penalty but it does not justify the conclusion that a death sentence should stand even though highly prejudicial inadmissible evidence was presented to the jury at the sentencing hearing. The introduction of such highly prejudicial, inadmissible evidence—evidence that itself represents an independent constitutional violation—quite clearly undermines the validity of the capital sentencing proceeding and violates the Eighth Amendment.

## IV

Thus, I would not only reach the merits of petitioner's constitutional claim but also would conclude that it has merit. The question that remains is the one the Court addresses in the last two paragraphs of its opinion—whether the constitutional error warrants the conclusion that the death penalty should be set aside in this habeas corpus proceeding. I think that question should be answered by reference to the language of the governing statute—the writ should issue "as law and justice require." To hold, as the Court does today, that petitioner's death sentence must stand despite the fact that blatant constitutional violations presumably made the difference between the jury's recommendation of life or death, violates not only "law," but, quite clearly, "justice" as well.

I respectfully dissent.

---

297 S. E. 2d, at 4. The Georgia Supreme Court, in its response to our certified question, expressly stated: 'A different result might be reached in a case where evidence was submitted in support of a statutory aggravating circumstance *which was not otherwise admissible* and thereafter the circumstance failed.' *Ibid.*" *Id.*, at 890 (emphasis added).