**Barry Lee FAIRCHILD, Petitioner,**

v.

**Larry NORRIS, Acting Director, Arkansas Department of Correction, Respondent.**

No. PB–C–85–262.

United States District Court, E.D. Arkansas, Pine Bluff Division.

Sept. 22, 1993.

Addendum to Memorandum Opinion Sept. 24, 1993.

Judgment reversed, 21 F.3d 799.

Herbert C. Rule, III, Rose Law Firm, Little Rock, AR, John W. Hall, Jr., John Wesley Hall, Jr., P.C., Little Rock, AR, Richard Burr, Steven W. Hawkins, NAACP Legal Defense Fund, Inc., New York City, Michael Laurence, San Francisco, CA, for petitioner.

Clint E. Miller, Olan W. Reeves, Atty. General's Office, Little Rock, AR, Jack Ward Gillean, Office of the Governor, State of Ark., Little Rock, AR, for respondent.

## MEMORANDUM OPINION

EISELE, District Judge.

Before taking up the pending Motion for Stay of Execution and for Writ of Habeas Corpus, for background purposes, I quote from the Conclusion to this Court's 413 pages of Findings of Fact and Conclusions of Law entered on June 4, 1991 after 18 days of hearings on this case during a prior habeas proceeding:

> This case raises some serious concerns in regard to the law relating to the imposition of the death penalty, but it does not raise any serious factual questions concerning the voluntariness of, or the essential accuracy of, Mr. Barry Lee Fairchild's confessions.
>
> The Court has carefully reviewed all of the evidence including, again and again, Mr. Fairchild's confessions. It is clear that Mr. Fairchild does not look upon himself as a "murderer," and the Court is convinced on the evidence before it that he

was not the one who shot and killed Ms. Mason. The Court is inclined to credit Mr. Fairchild's own confessions wherein he expressed both great surprise and disapproval immediately after hearing the shots fired on the other side of the old house—the two shots that fatally struck down Ms. Mason as she was walking from the house in the belief—so the Court concludes—that she was finally going to be free from the horrors of that evening. It is this Court's view that Mr. Barry Lee Fairchild intended, and believed his accomplice also intended, to wait until it was a little darker and then depart the scene without further abuse of Ms. Mason. Mr. Barry Lee Fairchild was using this time as an opportunity to rifle through Ms. Mason's purse and to take the money therefrom. It was at this point that he heard the unexpected shots.

In his video-taped confession Mr. Fairchild states that it was his accomplice, not he, who had the gun, a "little old nickel plate. I don't know if it was a .22 or a .25". The bullets removed from Ms. Mason were .22 caliber. And it will be recalled that Officer Ferguson observed the driver of the abandoned car (Mr. Fairchild) flee down 46th Street. But his accomplice crawled out of the vehicle and faced Ferguson in a squatting position. Officer Ferguson then "observed what appeared to be a weapon in his belt". So that tends to corroborate Mr. Fairchild's confession statements that it was his accomplice that had the only gun involved.

Of course, the jury that tried Mr. Fairchild may or may not have had a similar view of the case. The jurors obviously knew that Barry Lee Fairchild, in his confessions, lied when he identified Mr. Harold Green as his accomplice. While believing the main thrust of his confessions, they may have concluded that he was also lying when he said that his accomplice had actually shot Ms. Mason.

In any event, it is clear that the jury found, as this Court finds, that Mr. Barry Lee Fairchild and his companion kidnapped Ms. Mason, drove her in her car to the old house near Scott, Arkansas, and raped her. And at least one of them so-

domized her. And, of course, one of them also shot and killed her.

And the Court senses that Mr. Barry Lee Fairchild, in deciding to voluntarily confess, calculated that he might thereby make some deal with the state for a penalty of less than life without parole. However, the knowledge and motivation of Mr. Barry Lee Fairchild at the time he confessed is not clear from the evidence. He and Mr. Green had been involved in an incident a few months before (i.e., December of 1982) wherein shots were fired at Officer Oberle. In fact, Mr. Barry Lee Fairchild confessed to his involvement in that crime later on the same morning that he confessed to his part in the crimes against Ms. Mason. The evidence does not disclose whether Mr. Fairchild had any animus against Mr. Green at the time he confessed or whether he knew that Mr. Green was out of the state at the time of the murder and would thereby have an airtight alibi. In any event, the Court is inclined to believe that Mr. Fairchild thought that if he confessed and cooperated, the state would not seek the death penalty or the penalty of life without parole. Clearly, he looked upon the circumstances that he did not actually kill Ms. Mason, and that he did not believe or have any prior suspicion that his accomplice would kill her, as important. It is not clear to the Court that he understood, when he confessed to his involvement, that the state could, on the basis of the facts he had admitted, obtain either of those penalties. It appears that he decided to fight the confessions on the grounds that they were coerced only after he became aware of the state's full intentions and of the real possibility of these penalties under the Arkansas law.

The Court has previously identified the "serious concerns" that it believes are implicated by the rules and law governing this habeas proceeding. See Opinion of April 4, 1989, pp. 132–134, 136–137. As noted therein, Mr. Barry Lee Fairchild has controlled the issues he wished to have presented during his habeas proceedings. For instance, he has prohibited his attorneys from making any challenge to the penalty phase of his trial. The only authority he has given to his attorneys is to make those challenges which might ultimately result in a new trial and his freedom. If he cannot obtain that relief, he states that he wishes to be executed rather than spend the rest of his life in prison. And, he apparently made a similar decision based on the same rationale back at the time of his trial in state court: he instructed his attorneys that he did not wish them to put on evidence of mitigating circumstances at the penalty phase of that trial even though they had witnesses available for such purpose standing by.

This Court believes that the law should not leave to murderers, rapists and other criminals, the decisions which control the scope of legal review. The case should not be the "property" of the defendant. The people of the state of Arkansas and of the nation should have the right to expect that an independent judicial review would be undertaken to verify that the Constitution and laws of the state and nation are being followed before permitting the imposition of the death penalty. The *Gilmore* case, the *Gene Simmons* case, and this case, in various ways, all raise this issue. But the law appears now to be settled. A defendant in a death penalty case, if competent, can waive appeal to the state supreme court, and is also entitled to waive habeas review. And apparently this waiver can be exercised on a selective basis, i.e., the defendant may raise certain habeas issues and waive others.

This Court must follow the law as it is and not as the Court would like it to be. Despite the petitioner's attorneys' tentative and hedged-around suggestion (made near the conclusion of these remand hearings) that the Court, on its own, might wish to examine the penalty phase of Mr. Fairchild's case for possible errors, there is no authority for it to do so. First, Mr. Barry Lee Fairchild himself has never advised the Court that he wished it to undertake such a review. Secondly, if he did so, it would be outside of the scope of the remand order and would therefore have to

be addressed to the Eighth Circuit Court of Appeals.

Mr. Barry Lee Fairchild's confessions were voluntary. He was not coerced into giving them. The content of his confessions in the main came from his recollection of the events of the late evening of February 26, 1983, and not from suggestions made to him by law enforcement officers. The evidence heard on remand from the Eighth Circuit in no way changes these conclusions.

These remand hearings have essentially been a "trial" of, the Pulaski County Sheriff's Office's conduct of the Mason investigation. It has resulted in a "mixed bag" of findings. On the one hand the total record reflects an energetic, effective, comprehensive and professional investigation which has led to the conviction of one of the two persons involved in the crimes against Ms. Mason. On the other hand there are blemishes on this otherwise impressive record which cast a shadow over the process and tend unfairly to taint the work of honest professional law enforcement officers—not only—of those who were and are employed by the Pulaski County Sheriff's Office, but law enforcement officers everywhere, and law enforcement itself. This is sad because society is greatly in the debt of honest, effective and professional law enforcement officers. And such officers greatly need and merit the support of our citizenry. This having been said it must be added that in a democracy there are precious few things which are worse than the abuse of state conferred police powers. It is the people that confer this awesome power. They have the right to expect that it will be used honestly, professionally and, above all, lawfully. So, to some this case might provide a source of pride; to others this record will raise serious concerns.

Finally, these Fairchild habeas hearings, including the remand hearing conducted recently for some eighteen days, have provided a vehicle not only for vindicating the truth and thereby doing justice, but also for redressing real or imagined wrongs, for carrying forward old vendettas, for "getting even", for achieving notoriety, for showing solidarity, and for advancing ideological objections and deeply felt moral imperatives, often with a callous disregard for the truth.

But the truth is the only secure and durable path to justice.

And so, with these prior conclusions providing a backdrop, we reach the issues presently before the Court: Petitioner's Motion for a Stay of Execution and Petition for Writ of Habeas Corpus. Mr. Fairchild is scheduled for execution at 9:00 this evening, September 22, 1993. The Court has had the opportunity to review the Petition for Writ of Habeas Corpus. The Motion for a Stay of Execution pending a decision on the petition is DENIED. The Court will address the petition on the merits.

The Petition for Writ of Habeas Corpus presents two issues: 1) Whether the Petitioner was sentenced to death in violation of the Eighth Amendment's prohibition against cruel and unusual punishment because the jury was not required to find that Petitioner himself had the constitutionally mandated culpable mental state which would allow the imposition of a sentence of death; and 2) Whether Petitioner's constitutional claim is procedurally barred by the general prohibition against successive habeas corpus petitions. The Court will address the two issues separately, although in some sense, they are inextricably intertwined.

## I. Petitioner's Constitutional Arguments

Fairchild was convicted of capital murder under Ark.Stat.Ann. § 41–1502(1)(a) (1977) [Recodified § 5–10–102(a)(1) (1987) ], which states:

"A person commits capital murder if: 1) acting along or with one or more other persons he commits ... rape, kidnapping ... robbery and, in the course of and in furtherance of the felony,. or in immediate flight there from he or an accomplice causes a death of any person under circumstances manifesting extreme indifference to the value of human life."

During preliminary instructions to the jury before the trial of Mr. Fairchild began, the jury was instructed that:

Barry Lee Fairchild is charged with the offense of Capital Murder. To sustain this charge, the State must prove the following things beyond a reasonable doubt: (A) First: That Barry Lee Fairchild acting alone or with one or more other persons committed the crime of rape or kidnapping or robbery; and

Second: That in the course of and in the furtherance of one or more of those crimes, or in immediate flight therefrom, Barry Lee Fairchild or a person acting with him caused the death of Marjorie Mason under circumstances manifesting an extreme indifference to the value of human life.

At the end of the guilt phase of the trial, that instruction was repeated. The jury was also instructed that:

In this case the State does not contend that Barry Lee Fairchild acted alone in the commission of the offense of Capital Murder. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense.

An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense: Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense or having a legal duty to prevent the commission of the offense fails to make a proper effort to do so.

■ It is apparent from a close reading of the statute and the instructions in this case that the jury could have found the defendant guilty of capital murder even if they found that the accomplice *alone* caused the death of Ms. Mason under the circumstances manifesting extreme indifference to the value of human life. The jury was not required to find that Barry Lee Fairchild's state of mind manifested extreme indifference to the value of human life. Under Arkansas's statute, Mr. Fairchild can be convicted of capital murder if he *or* his accomplice causes the death of another in the course of a requisite felony under circumstances manifesting extreme indifference to human life. However, the Eighth Amendment's prohibition against

cruel and unusual punishment, as interpreted by the United States Supreme Court, prevents the state from seeking the death penalty unless the state proves and a jury finds that the defendant himself acted with the requisite intent, that is, with "extreme indifference to the value of *human life.*"

In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). *Enmund* was charged and convicted of capital murder even though he was only the driver of the get away car and even though he did not kill anyone, was not present at the killings, and did not intend that anybody be killed and did not expect that anyone would be killed. The Supreme Court added:

Here the robbers did commit murder; but they were subjected to the death penalty only because they killed as well as robbed. The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence," *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (footnote omitted, which means that we must focus on "relevant facets of the character and record of the individual offender." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Enmund himself did not kill or attempt to kill; and, as construed by the Florida Supreme Court the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder. Yet under Florida law death was an authorized penalty because Enmund aided and abetted a robbery in the course of which murder was committed. It is fundamental that "causing harm intentionally must be punished more severely than causing the same harm unintentionally." H. Hart, Punishment and Responsibility 162 (1968). Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State

treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment.

\* \* \* \* \* \*

It would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony. But competent observers have concluded that there is no basis in experience for the notion that death so frequently occurs in the course of a felony for which killing is not an essential ingredient that the death penalty should be considered as a justifiable deterrent to the felony itself.

\* \* \* \* \* \*

For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts. This is the judgment of most of the legislatures that have recently addressed the matter, and we have no reason to disagree with that judgment for purposes of construing and applying the Eighth Amendment.

In *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) the Supreme Court made it clear that certain culpable states of mind less than an actual intent to kill would suffice under such a felony murder statute. But it still insisted that to permit the death penalty it must be shown that that *defendant* had the necessary culpable mental state. In that case the Supreme Court explained that:

Some non-intentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have

the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill." Indeed it is for this very reason that the common law and modern criminal codes alike have classified behavior such as occurred in this case along with intentional murders..... *Enmund* held that when "intent to kill" results in its logical though not inevitable consequence—the taking of human life—the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Tison* thus modified *Enmund* in holding that the requisite mental state in order for the defendant to be eligible for the death penalty would include the defendant's *own* extreme indifference to the *value of human life.* The Court made it clear, however, that it must be the defendant's own personal state of mind and not that of this accomplice that is dispositive. This is the argument that I believe the state fails to recognize.

Because of the uniqueness of the death penalty in its severity and irrevocability, the Supreme Court has determined that the Eighth Amendment requires the State to inquire into the relevant facets of the character and record of the individual offender. *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Thus, in *Enmund,* "the focus [had to] be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration' as a constitutional requirement in imposing the death sentence." *Enmund,* 458 U.S. at 798, 102 S.Ct. at 3377. *Tison* did not change the requirement for individualized consideration of the defendant's own culpabil-

ity. *Tison* simply expanded the requisite intent from specific intent to kill to those situations where the defendant himself acts in such a manner that his own conduct "manifests extreme indifference to human life."

As this Court has stated previously, the evidence indicates that the defendant probably did not kill Ms. Mason. His video confession provide evidence that he was startled when he heard shots being fired. As stated by Judge Arnold in his concurring opinion in *Fairchild v. Lockhart,* 979 F.2d 636 (8th Cir.1992):

> As to the death sentence itself, Fairchild has been steadfast in deliberately withholding any attack that would gain for him only a reduction of sentence to life imprisonment. He probably did not kill Ms. Mason. The actual killing was probably done by his confederate, and Fairchild may not have intended or even expected this to happen. These facts could have been the basis of a well-founded attack on the sentence of death. Fairchild does not wish to bring such an attack. He has a right to make this decision, and, in my opinion, he is bound by it.

The Court will address the procedural problems identified by Judge Arnold below. The Court holds, however, that Petitioner's sentence of death was imposed in violation of the Eighth Amendment's prohibition against cruel and unusual punishment in that the jury was not instructed to find that Petitioner had the mental intent required for a sentence of death. Indeed, as set forth below, the jury *could not* have so found.

## II. Petitioner's Argument that He is Not Procedurally Barred

The question then becomes whether this Court has the authority or ability to address the claims before it. Mr. Fairchild has been before this Court on three prior occasions. On all three of those occasions, Mr. Fairchild was attacking the validity of the underlying conviction. He has never brought a challenge to the penalty phase before this or any other Court. Indeed, for more than ten years, he has steadfastly refused to allow his attorneys to present any penalty claims to any Court, even refusing to allow his attorneys to present mitigation evidence at the penalty phase of his trial. He has maintained in explicit terms that he would rather be executed than spend the rest of his natural life in prison, which is the only other alternative for a conviction of capital murder.

■ As long as Mr. Fairchild maintained that position, neither this Court nor any other was permitted to examine the penalty of death imposed upon Mr. Fairchild. The Supreme Court decided this issue in *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). In that case, the Supreme Court held that if a defendant makes a knowing and intelligent waiver of his federal rights, no other party has standing to assert the unconstitutionality of the defendant's conviction or penalty. Therefore, a competent defendant may waive review of his sentence, and even if the penalty of death was imposed in violation of the constitution, the state may carry out an execution. And that is exactly what happened in the *Gene Simmons* case. This Court has expressed its belief that it is unseemly for a murderer to determine his own punishment:

> (W)hen we speak of the requirement that executions not take place until a death sentence has been reviewed we are not talking about a "right" that is *personal* to (the defendant). It is, rather, the embodiment of societal values against cruel and unusual punishment. If *a* state court sentenced a defendant to be boiled in oil, and the defendant, for whatever reason, declined to object, would a horrified nation be forced to stand by while the sentence was carried out. If a defendant is innocent may the state be allowed to convict and execute him because he wishes to be executed?

> \* \* \* \* \* \*

> If ... the governing law were susceptible to more than one construction, this Court would conclude that the unique and awful nature of the execution of another human being dictates recognition of an exception to traditional standing and waiver rules so as to protect values shared by us all, values which are more important than a mur-

derer's desire to be put to death immediately.

*Franz v. Lockhart,* 700 F.Supp. 1005 (E.D.Ark.1988). However, this Court is bound by the rulings of the Supreme Court and, because of Mr. Fairchild's refusal to challenge the penalty portion of his trial, this Court has never addressed the death penalty itself as it was imposed in this case.

On September 20, 1993, two and one-half days before his scheduled execution, Mr. Fairchild signed a statement authorizing his attorneys "to seek a sentence less than death." That statement was immediately forwarded to this Court, and later that day his attorneys did in fact seek review of Mr. Fairchild's death sentence in this Court. During a hearing this morning before Magistrate Judge Henry Jones, Jr., Mr. Fairchild authorized this last minute intervention on his behalf in open Court. So the Court must decide whether Mr. Fairchild's claim is procedurally barred. The Court does not condone the delay tactic employed by the defendant in this case. The present challenge could have been presented before this Court during his first habeas review eight years ago. Instead, Mr. Fairchild has chosen only to bring this challenge after failing on every challenge that could be brought against the underlying conviction. Nevertheless, for reasons set out below, this Court concludes that the claim is *not* procedurally barred and must be addressed on the merits.

 Unless a habeas petitioner shows cause and prejudice, see *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), a court may not reach the merits of a successive claim which raises grounds identical to grounds heard and decided on the merits in a previous petition, *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); new claims, not previously raised which constitute an abuse of the writ, *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); or procedurally defaulted claims in which the petitioner failed to follow the applicable state procedural rules in raising the claims. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). However, even if a prisoner cannot meet the cause and prejudice

standard enunciated in *Wainwright,* and Mr. Fairchild cannot do so here, a federal court may hear the merits of the successive claims *if* the failure to hear the claims would constitute a "miscarriage of justice." *Sawyer v. Whitley,* —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). This is also referred to as the "actual innocence" exception. *Id.* The miscarriage of justice exception is concerned with actual as compared to legal innocence. *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). In *Smith,* the Court found that the petitioner had failed to show actual innocence of the death penalty because the "alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones." *Id.* at 538, 106 S.Ct. at 2668. The Court did hold, however, that actual innocence can apply to the crime of which the petitioner is convicted *or* the penalty which was imposed. *Id.* Furthermore, *a showing of cause for the default is not required under the actual innocence exception. Id.* The Supreme Court recognized that this exception could, in some cases, be used to manipulate the system:

> In the every day context of capital penalty proceedings, a federal district judge typically will be presented with a successive or abusive habeas petition a few days before, or even on the day of, a scheduled execution, and will have only a limited time to determine whether a petitioner has shown that his case falls within the "actual innocence" exception if such a claim is made.
>
> \* \* \* \* \* \*
>
> While we recognize this as a fact on the basis of our own experience with applications for stays of execution in capital cases, we regard it as a regrettable fact. We of course do not in the least condone, but instead condemn, any efforts on the part of habeas petitioners to delay their filings until the last minute with a view to obtaining a stay because the district court will lack time to give them the necessary consideration before the scheduled execution. A court may resolve against such a petitioner doubts and uncertainties as to the sufficiency of his submission.

*Id.* —— U.S. at ——, and at n. 7, 112 S.Ct. at 2520, and at n. 7 (citations omitted). Thus, it

is clear to this Court that, while such last minute filings are to be viewed with some skepticism and should not be encouraged, the import of the possibility of executing a defendant who is actually innocent of the death penalty is such that last minute filings may, indeed, *must,* be addressed by the Court.

■ In *Sawyer,* the Court went into great depth in its attempt to define how one could be "actually innocent of the death penalty". The Court found that "(s)ensible meaning is given to the term 'innocent of the death penalty' by allowing, *in addition* to innocence of *the capital crime* itself a showing that there was no aggravating circumstance *or that some other condition of eligibility had not been met.*" *Sawyer,* at ——, 112 S.Ct. at 2522. In order to qualify for the "actual innocence" exception, the petitioner must show by clear and convincing evidence that but for constitutional error, no reasonable juror would have found him eligible for the death penalty.

Thus, this Court must review the trial record in its totality and determine whether *any* reasonable juror could have found Mr. Fairchild guilty of the death penalty on the evidence submitted at trial. This Court concludes that no reasonable juror could have sentenced Mr. Fairchild to death on that evidence. This is not to criticize the jury's verdict. The Court's instructions did not call upon the jury to focus on Mr. Fairchild's state of mind in relation to the murder of Ms. Mason.

■ It is well established that in a criminal trial, the state has the burden of proving each and every element of the offense beyond a reasonable doubt. In this case, as discussed above, the state must also prove beyond a reasonable doubt that Mr. Fairchild's own actions manifested a culpable mental state of extreme indifference to human life before it may obtain the death penalty.

This Court has thoroughly examined the trial record in this case. The state presented no evidence that Mr. Fairchild himself murdered the victim, that he aided or abetted the murder, that he ever intended that the victim be murdered, that he believed or foresaw that she would or might be murdered, or that

he was present when the murder took place. The crucial evidence in this case consists of the two videotaped confessions taken on March 5, 1983 and Mr. Fairchild's testimony at trial.

In the two videotaped confessions, Mr. Fairchild went into explicit detail concerning the abduction, rape, and robbery of the victim. He freely implicated himself in those crimes. This Court has previously held extensive fact-finding hearings on this case and is convinced that Mr. Fairchild's videotaped confessions are chillingly accurate as to his role in this horrible episode. In light of this Court's exhaustive findings on this matter in previous hearings, the Court will simply state here that there is no reasonable doubt as to whether Mr. Fairchild is guilty of those offenses to which he confessed. He helped kidnap Ms. Mason, he raped and robbed her.

However, in both of those confessions, Mr. Fairchild stated that he was sitting in the car going through the victim's purse when he heard the fatal gunshots, and that he was startled and *surprised* by the shots. This Court has previously stated that it "was inclined to credit Mr. Fairchild's own confessions wherein he expressed both great surprise and disapproval immediately after hearing the shots fired on the other side of the old house. It is this Court's view that Barry Lee Fairchild intended, and believed his accomplice also intended, to wait until it was a little darker and then depart the scene without further abuse of Ms. Mason. Mr. Barry Lee Fairchild was using this time as an opportunity to rifle through Ms. Mason's purse and to take the money therefrom. It was at this point that he heard the unexpected shots."

The jury also viewed these videotapes. The jury then saw Mr. Fairchild testify in his own defense during the trial. He testified that the two confessions had been coached and beaten out of him. He stated that he had nothing to do with any of the crimes committed against Ms. Mason on February 26, 1983. He denied ever being at the crime site before being taken there by the police officers after he was arrested. He denied ever seeing Ms. Mason.

The jury is the judge of credibility. The jury could, and apparently did, find that Mr. Fairchild's trial testimony was incredible and perjured. In certain restricted circumstances—where, for example, a witness' story is implausible—disbelief of testimony on a certain point can support the truth of what the witness denies. *United States v. Chase*, 503 F.2d 571, 573 (9th Cir.1974). Authority for permitting juries to draw negative inferences from disbelieved testimony lies in *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952): "The denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." Prophetically, Judge Learned Hand noted in that opinion that "although it is true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him. This is owing to the fact that otherwise there could not be an effective appeal from the judge's disposition of a motion for a directed verdict. He who has seen and heard the 'demeanor' evidence, may have been right or wrong in thinking that it gave rational support to a verdict; yet, since that evidence has disappeared, it will be impossible for an appellate court to say which he was. Thus (the trial court) will become the final arbiter in all cases where the evidence of witnesses present in court might be determinative." For this reason, among others, the weight that should be afforded to negative inferences is a "difficult and important question." *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C.Cir.1991).

In other words, as Judge Hand recognized, if demeanor evidence and negative inferences were allowed to be the sole determinative evidence, no decision by a jury would be reviewable. Taken to its extreme, this scenario could end-run the constitutional protections of burdens of proof and appellate review. The government could bring charges against an individual with no substantive evidence and secure an unreviewable conviction based simply on a defendant's denial of the charges.

No Court has been willing to go that far. One Court has commented that "such cases are unlikely to occur, for if there is no evidence of guilt other than what the defendant might supply by offering protestations of innocence that the jury disbelieved, he would have no reason to take the stand; he would be entitled to a directed acquittal at the close of the government's case." *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir.1991). Another Court addressing the issue found that "a jury is free, on the basis of a witness' demeanor, to 'assume the truth of what he denies' although a court cannot allow a civil action, much less a criminal prosecution, to go to the jury on the basis of this alone." *United States v. Marchand*, 564 F.2d 983, 986 (2d Cir.1977). Here, where the stakes are highest and the ultimate penalty is at issue, this Court adopts the use limitations established by the Second Circuit in *United States v. Chase*, 503 F.2d at 573: "(T)he use of denials to support opposite propositions could not be used to support a finding of fact where, for example, the only basis for drawing the opposite inference was demeanor ... *There must be other objective evidence on the record which buttresses the fact finder's drawing of the opposite inference." Id.* at n. 4 (emphasis supplied). This holding is consistent with Justice Thomas's recent plurality opinion in *Wright v. West*, —— U.S. ——, ——, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992), where he stated that the jury was "entitled to consider whatever it concluded to be perjured testimony as *affirmative evidence of guilt." Id.* (Emphasis supplied). All courts which have addressed the issue have found that a jury's findings of what it considers to be perjured testimony may be affirmative evidence of guilt. No Court has held that such evidence, *without more*, can be sufficient to meet the government's burden of proving every essential element beyond a reasonable doubt.

This Court's holding today also finds support in this Circuit. In *United States v. Todd*, 657 F.2d 212 (8th Cir.1981), the Court considered the sufficiency of the evidence of a conviction for conspiracy to commit mur-

der. In that case, the defendant had made two statements concerning the robbery/murder. Neither statement acknowledged any prior plan to murder.

The government recognizes that neither of Todd's statements made any reference to a plan or agreement to murder Williams. The government's contention is that because Williams and the alleged conspirators were members of the same basic training company and because Todd stated that they intended to rob Williams, it is reasonable to assume that they planned also to murder him so that he would not identify them after the robbery. We are unaware of any case in which a court or jury was allowed to convict on the basis of inference alone.

The government has not presented an admission by the defendant of a conspiracy to murder; nor has it offered any evidence of an agreement between Todd and another person to murder Williams. Although the government is allowed to prove an agreement by circumstantial evidence, *United States v. Taylor, supra,* 599 F.2d [832] at 838 [ (8th Cir.1979) ], here there is *only speculation and inference.* This court has said that the "(e)vidence must do more than merely raise suspicion of possibility of guilt. Surmise cannot be permitted in a criminal case." We are not convinced that the evidence here was sufficient to prove beyond a reasonable doubt that Todd was involved in a conspiracy to murder Williams. We reverse the conviction of conspiracy to murder.

*Id.* at 217 (citations omitted). Just as the government failed to prove an essential element in *Todd,* they have failed to prove an essential element here. Inferences alone will

not suffice to establish the requisite culpable mental state.

## III. Conclusions

Having reviewed the entire trial record, this Court finds that the only evidence of Mr. Fairchild's "manifest indifference to the value of human life" presented to the jury was the negative inferences that they could have drawn from *disbelieving* the statements made by Mr. Fairchild concerning the actual murder, either the videotaped confessions or his trial testimony. Indeed, the state attempted to bolster the *credibility* and reliability of Mr. Fairchild's videotaped confessions in closing argument to the jury so that they could and would find that Mr. Fairchild did indeed kidnap, rob and rape Ms. Mason. Yet the only possible proof that would justify a properly instructed jury to find that Mr. Fairchild acted with the requisite culpable mental intent to qualify for the death penalty would be the possible negative inference that the jury could have found by disbelieving his story concerning the murder in those same credible, reliable confessions. Although when reviewing a claim of insufficiency of the evidence the record must be viewed in the light most favorable to the prosecution, this Court holds that, as a matter of law, the government's proof was insufficient to allow any properly instructed reasonable juror to find the defendant guilty of the death penalty. This Court further holds on the basis of the evidence presented during the trial in the state case that the defendant is in fact actually *innocent of the death penalty.* Of course, he is guilty of the crime of capital murder. But Mr. Fairchild fits within the rare "actual innocence of the death penalty" exception to the general bar on successive habeas appeals.[1] Through this actual

1. On Wednesday, September 22, 1992, the Court received a letter from petitioner's attorneys, via facsimile, which stated in part that:

It seems to be clear that the Federal Court which is faced with a petition for habeas corpus raising an *Enmund* claim:

... must examine the entire course of the state court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made. *Cabana v. Bullock,* 474 U.S. 376, 387, 106 S.Ct. 689, 697, 88 L.Ed.2d 704 (1986).

It also appears that if relief is granted by the Federal Court that the case should be remanded to the State Court to allow it "... an opportunity to carry out in the first instance the factual inquiry called for by *Enmund." Cabana, supra,* at 391, 106 S.Ct. at 699–700. *Cabana* concerned an initial habeas, and the petitioner was not required to establish either the "cause and prejudice" or actual innocence exceptions to the general bar on successive petitions for writs of habeas corpus. This case involves a successive petition. The Court has only been able to reach the merits of the petition by

innocence exception, this Court is justified in reaching the merits of Mr. Fairchild's constitutional arguments, and it holds that the jury in this case was improperly instructed in a manner which violates the Supreme Court's Eighth Amendment jurisprudence.[2] The petition has shown by clear and convincing evidence that but for the constitutional error, no reasonable juror would have found him eligible for the death penalty. To allow Mr. Fairchild's death sentence to stand would be in violation of the law of the land.

Although Mr. Fairchild is "actually innocent" of the death penalty, he is still guilty of capital murder. As the only alternative punishment for capital murder is life without the possibility of parole, that is now Mr. Fairchild's sentence.

Judgment will be entered accordingly.

IT IS SO ORDERED.

### JUDGMENT

Pursuant to the Memorandum Opinion entered this day, IT IS ORDERED AND ADJUDGED that the sentence of death imposed upon Mr. Fairchild be, and it is hereby, VACATED.

IT IS FURTHER ORDERED AND ADJUDGED that Mr. Fairchild's sentence is now life without the possibility of parole, as required by Arkansas law.

IT IS SO ORDERED.

determining that Mr. Fairchild is actually innocent of the death penalty, i.e., that *no* reasonable jury could have found Mr. Fairchild guilty of the death penalty. In light of the findings that the Court was required to make to even address the Petition, the issue is resolved and there will be no remand to state court to determine whether the defendant acted with the required culpable intent. This Court has already determined as a matter of law that no properly instructed rational jury could have so found.

2. The Court is, of course, concerned by the last statements in Judge Arnold's concurring opinion in *Fairchild v. Lockhart*, 979 F.2d 636 (8th Cir. 1992):

These facts could have been the basis of a well-founded attack on the sentence of death. Fairchild does not wish to bring such an attack. He has a right to make this decision, and, in my opinion, he is bound by it.

### ADDENDUM TO MEMORANDUM OPINION OF SEPTEMBER 22, 1993

The time constraints under which the Court was operating Wednesday in attempting to resolve the Petition for Habeas Corpus on the merits, while still allowing time for *some* expedited review by the Eighth Circuit Court of Appeals, necessarily resulted in a limited ability to fully develop all of the concerns this Court has had with this case. Therefore, the Court will now address several points which were not discussed, or not adequately discussed in Wednesday's opinion.

### I. Extreme Indifference to the Value of Human Life

The crux of this case, as this Court views it under existing law, is whether the actions to which Mr. Fairchild confessed could in themselves constitute the basis for a jury to find that he possessed the requisite culpable mental state which in turn could justify the imposition of the death penalty. It is this Court's opinion that they do not.

The Arkansas statute at issue, now codified at Ark.Code Ann. § 5–10–101, provides for the death penalty for that "intermediate category" of felony-murders identified by the United States Supreme Court in *Tison v. Arizona*, 481 U.S. 137, 151–53, 107 S.Ct. 1676, 1685, 95 L.Ed.2d 127 (1987). Arkansas's statute does not provide for conviction for capital murder for felony murder *simpliciter*, defined as murder in the course of

The Court notes, however, that this was dicta concerning an issue which the attorneys had not prepared and developed for the Court's review. This Court does not know if Judge Arnold was familiar with *Sawyer v. Whitley* which was decided a few months before the above remark was made in the *Fairchild* case. Prior to having the issues fully set forth before the Court and fully briefed, this Court would have thought that Mr. Fairchild would be procedurally barred from presenting a challenge to his penalty. As this Order explains, after having the issue fully developed, this Court is convinced that Petitioner is not procedurally bound by his prior decisions not to attack the penalty phase. In any event I do not view Judge Arnold's statement as Eighth Circuit precedent that would control this issue. If I am wrong, I will undoubtedly be soon so advised.

certain specified felonies with no showing of any kind of culpable intent. The statute, however, does not limit the crime of capital murder to those who actually killed, attempted to kill, or intended to kill, which was the issue in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Arkansas's statute requires a showing of "circumstances manifesting extreme indifference to the value of human life." Ark.Ann.Code § 5–10–101. "Circumstances" must mean the acts, words and conduct of the person whose state of mind is at issue. Thus, some showing of culpable intent, extreme indifference to the value of human life, is required, although specific intent to kill is not required. The intent required by the Arkansas statute, as just quoted, if proven to be the mental state of the defendant himself, is sufficiently culpable to justify the death penalty under *Tison.*

The Court's opinion of September 22, 1993, sets out in some detail this Court's analysis of the basis for its finding that the state failed to prove beyond a reasonable doubt that Mr. Fairchild actually killed, attempted to kill or intended to kill Ms. Mason, or that he understood before the fact that she would be murdered. Some more analysis may be helpful to explain why the Court has concluded that Mr. Fairchild's actions, which he confessed to, did not, and could not, suffice as a basis for a finding of extreme indifference to the value of human life.

The crimes which Mr. Fairchild admitted to in the video-taped confessions, and which this Court believes he committed, are vicious and inherently dangerous crimes. He and an armed accomplice kidnapped Ms. Mason. They took her to a remote location. At that location, Ms. Mason was raped by both men. Her purse was taken from her. Yet there was nothing in the trial record to indicate that Mr. Fairchild contemplated the use of lethal force. Crediting his video-taped confessions, and there is no evidence to the contrary, he knew that his accomplice was armed. That knowledge converts to knowledge of danger. However, there is no indication that Mr. Fairchild knew or believed that the gun would be used. Once he and his accomplice got to the old abandoned house, Ms. Mason was taken inside, where Mr. Fairchild raped her.

Rape is "highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of ... the victim ... Short of homicide, it is the 'ultimate violation of self' ... It is also a violent crime because it normally involves force, or the threat of force or intimidation ... [However], rape by definition does not include the death of or even the serious injury to another person." *Coker v. Georgia,* 433 U.S. 584, 597, 97 S.Ct. 2861, 2869, 53 L.Ed.2d 982 (1977). For that reason, the United States Supreme Court has held that although rape is "without doubt deserving of serious punishment ... it does not compare with murder", *Id.* at 598, 97 S.Ct. at 2869. It has further held that a sentence of death is grossly disproportionate and excessive punishment for the crime of rape and therefore forbidden by the Eighth and Fourteenth Amendments. *Id.*

There is no evidence that Mr. Fairchild was armed when he raped Ms. Mason, or that he contemplated the use of *lethal* force to overcome her. The rape by itself may have been brutal, and would certainly have been psychologically shattering. However, Mr. Fairchild's rape of Ms. Mason, while demonstrating extreme indifference to her "personhood", as well as extreme indifference to any sort of moral code, would not, under the Supreme Court's reasoning, manifest extreme indifference to "the value of *human life.*"

After Mr. Fairchild's rape of Ms. Mason, he went out of the house and sat in her car and then started rifling through her purse while his accomplice was in the house where the accomplice apparently raped Ms. Mason again. The cruelty and depravity involved here cannot be overstated. Nevertheless, there in nothing in the trial record to indicate that Mr. Fairchild contemplated that his accomplice would do anything more than he himself had done, and what he had done had not involved lethal force. Indeed, it is apparent from his confession that Fairchild thought that the he and his accomplice would wait until it was darker and then release Ms. Mason and leave the scene. Mr. Fairchild's

*own* actions and conduct did not manifest an extreme indifference to the value of human life as that concept is explained by the Supreme Court. There is no evidence that he took Ms. Mason's life, or that he attempted or intended to take it. There is no evidence that he advised or assisted his cohort in the murder, that he knew, foresaw or contemplated the taking of her life, or that he was present when the fatal shots were fired. Fairchild committed rape, kidnapping, and robbery. All are among the felonies listed in the capital murder statute and all are inherently dangerous. But the Arkansas statute does not authorize a conviction for capital murder simply for participation in those felonies when a death of another person occurs. It requires participation *plus* extreme indifference to the value of human life. If extreme indifference to the value of human life could be found simply on the basis of the inherent dangerousness of the underlying felony, the phrase "under circumstances manifesting extreme indifference to the value of human life" would be a nullity.

When the United States Supreme Court analyzed this issue in *Tison,* it considered a number of factors. It noted "the apparent consensus that substantial participation in a violent felony under circumstances *likely to result in the loss of innocent human life even absent an intent to kill*" would suffice for requisite intent as a basis for the imposition of the death penalty. *Tison,* 481 U.S. at 154, 107 S.Ct. at 1686 (emphasis supplied). The cases cited by the Supreme Court all concern defendants who had some awareness that a killing would be a likely result of the crime in which they were participating. In *Clines v. State,* 280 Ark. 77, 656 S.W.2d 684 (1983), the Court noted that killing was contemplated by the defendant. In *Deputy v. State,* 500 A.2d 581 (Del. 1985), there was evidence that the defendant participated in the killing. In *Ruffin v. State,* 420 So.2d 591 (Fla.1982), the court noted that the defendant "knew that (his accomplice) was going to kill her and made no effort to interfere with the killing." In *People v. Davis,* 95 Ill.2d 1, 69 Ill.Dec. 136, 447 N.E.2d 353 (1983), the defendant was present at the scene and had reason to believe that the accomplice would kill, because

the defendant had been in similar circumstances with the accomplice when the accomplice had killed. In *Selvage v. State,* 680 S.W.2d 17 (Tex.Cr.App.1984), the Court noted that the defendant fired a weapon at those who gave chase although there was no evidence that it was the defendant himself who shot the guard. All of these cases define circumstances where the loss of innocent life was likely to occur. Mr. Fairchild's actions simply do not fit into the category delineated by *Tison* in its modification of *Enmunds.* Indeed, *Tison* itself concerned defendants exhibiting far more culpability than Fairchild:

> (Petitioner) brought an arsenal of lethal weapons into the Arizona Sate Prison which he then handed over to two convicted murderers, one of whom he knew had killed a prison guard in the course of a previous escape attempt. By his own admission he was prepared to kill in furtherance of the prison break. He performed the crucial role of flagging down a passing car occupied by an innocent family whose fate was then entrusted to the known killers he had previously armed. He robbed these people at their direction and he guarded the victims at gunpoint while they considered what next to do. He stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting.

*Tison,* 481 U.S. at 151, 107 S.Ct. at 1685. The *Tison* Court examined the Arizona Supreme Court's analysis of the case, in which it attempted to reformulate "intent to kill" as a species of foreseeability. The Arizona Supreme Court maintained that "(i)ntent to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." *Id.* at 149–50, 1684, citing *State v. Tison,* 142 Ariz. 454, 456, 690 P.2d 755, 757 (1984). Noting that this definition went substantially further than *Enmunds,* the United States Supreme Court further found that it simply went too far:

> (T)he possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and

foreseen; it is one principal reason that felons arm themselves. The Arizona Supreme Court's attempted reformulation of intent to kill *amounts to little more than a restatement of the felony-murder rule itself.*

*Id.* 481 U.S. at 151, 107 S.Ct. at 1684 (emphasis supplied). And yet, there is nothing in the record in Mr. Fairchild's case to indicate that he even met the Arizona Supreme Court's definition of "intent to kill" which the United States Supreme Court held to be an insufficiently culpable mental intent to justify the death penalty. Participation in a violent felony is simply not enough. As *Enmunds* explained:

> Here the robbers did commit murder; but they were subjected to the death penalty only because they killed as well as robbed. The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmunds own conduct. The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence."

*Enmund,* 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982) (citations omitted). The Court went on to explain why simple participation in the underlying felony was not enough:

> It would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony. But competent observers have concluded that there is no basis in experience for the notion that death so frequently occurs in the course of a felony for which killing is not an essential ingredient that the death penalty should be considered as a justifiable deterrent to the felony itself.

*Id.* at 799–801, 102 S.Ct. at 3378. Clearly, the same statement could be made about rape. Indeed, more people are probably killed in the course of robberies than in connection with rapes. And even though *Tison* modified the mental state required for

death eligibility, the underlying notion remains that something beyond participation in an inherently dangerous and risky felony is required to justify a sentence of death.

For reasons which were set out thoroughly in the Court's September 22, 1993 opinion, this Court finds Mr. Fairchild has demonstrated by clear and convincing evidence that no properly instructed reasonable jury could have found beyond a reasonable doubt that he possessed the requisite culpable state of mind at the time of the death of Ms. Mason. Nothing more than participation in inherently dangerous felonies was proven beyond a reasonable doubt, and that is not enough to permit the imposition of the death penalty.

## II. Aggravating and Mitigating Circumstances and the Affirmative Defense

In spite of the Court's belief that no properly instructed jury could have found the proper intent, certain findings, or lack thereof, by the jury might be argued to suggest that the jury *could* have found the required mental state had it been properly instructed.

During the penalty phase, the jury was instructed that, having found the defendant guilty of capital murder, they must next decide the penalty. They were first to consider the three statutory aggravating circumstances. If they found no aggravating circumstances had been proven beyond a reasonable doubt, they were to impose a sentence of life without possibility of parole. If they found one or more of these aggravating circumstances, then they were to consider any mitigating circumstances which, more probably than not, existed at the time of the murder, including many which were specified on the form. They were then to determine whether the aggravating circumstances outweighed beyond a reasonable doubt any mitigating circumstances and whether the aggravating circumstances justified beyond a reasonable doubt the sentence of death.

There were four "levels of confidence" that a jury could express for the mitigating circumstances. One sheet gave listed factors that the jury was to check if it *unanimously* agreed that it was probable that the circumstance existed. One sheet was for the jury

to check if *one or more of the members* of the jury found evidence that it was probable that the circumstance existed. One was for the jury to check if they found that there was some evidence of mitigating circumstances, but no member of the jury felt that the circumstance existed. And, finally, the jury could check that there was no evidence of any mitigating circumstance. This last choice was the box that the jury picked in this case.

One of the listed choices for mitigating circumstances was that "(t)he capital murder was committed by another person and Barry Lee Fairchild was an accomplice and his participation relatively minor." Clearly, no member of the jury found that there was any evidence of this circumstance.

May it be plausibly argued that this is an indication that the jury believed that Mr. Fairchild exhibited the requisite culpable mental intent, as defined by *Tison?* The Court thinks not.

First, from the wording of the mitigating circumstance, as presented to the jury, it is obviously unclear whether the jury had to find that Mr. Fairchild's minor participation as an accomplice related to the entire crime or to the murder itself. If they believed that they had to find that his participation as an accomplice to the overall crime was minor, which is how this Court would view the language, then of course, the jury was right in not finding that particular mitigating circumstance since, as we all know, Mr. Fairchild was a major participant in the overall crime, even though he had *no* participation in the murder itself.

■ Second, a finding that there was no evidence presented that he played a minor accomplice role does not translate into a finding that the state proved beyond a reasonable doubt that he had sufficient culpable mental intent, as required by law. Although the jury could, of course, consider any evidence on this point and could find a mitigating circumstance even if Mr. Fairchild himself put on no proof, the existence of a mitigating circumstance will almost always be shown by the defense. The state has no motive to put on proof of mitigating circumstances. In this case, consistent with Mr.

Fairchild's prior decisions that he would rather be executed than spend the rest of his life in prison, Mr. Fairchild would not allow his attorneys to put on any evidence in mitigation at the penalty phase of the trial. Clearly, under such circumstances, a finding that evidence of a mitigating circumstance had not been presented does not equate to a finding of its opposite. In other words, the fact that the jury found no evidence that Mr. Fairchild was a minor accomplice in the "overall" crime is not the same as a finding that he was a culpable accomplice in the actual murder.

■ The same basic analysis applies to the issue of the statutory affirmative defense. The capital murder statute provides that "(i)t is an affirmative defense to any prosecution under (the section of the statute under which Fairchild was convicted) for an offense in which the defendant was not the only participant that the defendant did not commit the homicidal act or in any way solicit, command, induce, procure, counsel, or aid its commission." The defendant asked that the jury be instructed accordingly, and the jury was in fact given an instruction which read:

Barry Lee Fairchild asserts an affirmative defense to the charge of Capital Murder. To establish this affirmative defense, Barry Lee Fairchild must prove each of the following things:

First: That he was not the only party to the offense;

Second: That he did not commit the homicide act; and

Third: That he did not in any way solicit, command, induce, procure, counsel, or aid its commission.

Barry Lee Fairchild has the burden of proving this defense by a preponderance of the evidence, unless the defense is so proved by other evidence in the case. "Preponderance of the evidence: means the greater weight of evidence. The greater weight of evidence is not necessarily established by the greater number of witnesses testifying to any fact or state of facts. It is the evidence which, when weighed with that opposed to it, has more

convincing force and is more probably true and accurate. If the evidence with regard to this defense appears to be equally balanced, or if you cannot say upon which side it weighs heavier, then the defense has not been established. If you find that this defense has been established by the Defendant, then you shall find Barry Lee Fairchild not guilty of the offense of Capital Murder. Whatever may be your finding as to this defense, you are reminded that the State still has the burden of establishing the guilt of Barry Lee Fairchild upon the whole case beyond a reasonable doubt.

This instruction was given at the end of the guilt phase of the trial, and it is a defense to the crime of Capital Murder, not just to the imposition of the death penalty. Again, a failure of the jury to find that *Fairchild proved by a preponderance of the evidence* that he did not "commit the homicidal act or in any way solicit, command, induce, procure, counsel, or aid its commission" does not equate with a finding that the *state proved beyond a reasonable doubt* that he did commit the homicidal act or in any way solicited, commanded, induced, procured, counseled, or aided its commission. Nor does it establish that the state proved beyond a reasonable doubt that Fairchild manifested extreme indifference to the value of human life.

### III. Constitutionality of Arkansas's Capital Murder Statute

■ The Court would like to emphasize what its ruling on Wednesday did *not* do. The Court did *not* hold that Arkansas's Capital Murder Statute was unconstitutional on its face. It held that the imposition of the death penalty, in this case, was unconstitutional because the state failed to prove beyond a reasonable doubt that which is constitutionally required for imposition of the death penalty: that the defendant himself have acted with "extreme indifference to the value of human life." The state is *not* required to prove that the defendant himself had the culpable mental state in order to convict him of Capital Murder if the state waives the death penalty and seeks a sentence of life without the possibility of parole; it is enough to convict the defendant of capital murder if the state proves that the defen-

dant *or* his accomplice acted with the requisite intent. It is only when a sentence of death is sought that the state is required to prove the defendant's own mental state beyond a reasonable doubt.

The Court sees at least two possible alternatives to make sure that defendants charged under the Arkansas statute are only sentenced to death in a manner consistent with the Constitution. One possibility is that the legislature could amend the statute to so that it plainly requires a jury to make a finding that the defendant's own mental state at the time of the murder manifested extreme indifference to the value of human life before it may consider a sentence of death.

If the legislature declines to amend this statute, it will be the duty of the courts to ensure that the Constitutional requirements for the imposition of the death penalty are met. One method of so doing would involve adding another "tier" of instructions at the penalty phase if the state seeks a sentence of death. The jury could be instructed that it must first decide whether the government proved beyond a reasonable doubt that the defendant's own mental state at the time of the murder manifested extreme indifference to the value of human life. The jury should be instructed that if it does not so find, it should end its deliberations and return with a sentence of life without the possibility of parole. If the jury finds that the government meets this burden, it may then go on to consider the aggravating and mitigating circumstances in the same manner it was instructed to do in this case.

Of course, if there is no accomplice, a finding of guilt under the present statute would be sufficient to establish that the defendant himself had the culpable mental intent necessary to be eligible for a sentence of death.

Neither of the above alternatives would have saved the sentence imposed in this case, however. No reasonable jury, even a properly instructed one, could have found, on the basis of the evidence presented at trial, that the government proved beyond a reasonable doubt that Fairchild's own mental state man-

ifested extreme indifference to the value of human life.

## IV. Concluding Thoughts

This Court, in its September 22, 1993 opinion, noted the tragedy of subjecting the family of the victim and the public to ten years of litigation because of the defendant's manipulation of the legal system. Had this Court been allowed, back in 1985, to look into the constitutionality of the death sentence as it was applied in this case when the matter first came before it, much needless grief and cost could probably have been avoided.

The Court has expressed its view, both in its September 22, 1993 opinion and in other cases, that a habeas petition should not be considered the property of a defendant. The criminal defendant should not be permitted to pick and choose which issues and which avenues he wishes to pursue and when he wishes to pursue them. Society has an interest, especially in a capital case, in making sure that its laws are enforced in accordance with the Constitution. To allow a convicted murderer and rapist to decide whether the Constitution will be given effect in a particular case is unseemly and fails to treat our Constitution with the dignity and respect that it deserves. Such rules can result in obvious constitutional violations or in unconscionable delays in presenting such issues, such as we find in this case.

This Court hopes that the United States Supreme Court will one day reconsider its decision in *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). When it appears that an execution is about to take place in violation of our Constitution, traditional laws of standing are not sufficient to protect the values of our society. If Mr. Fairchild had not chosen, at the last minute, to challenge the imposition of the death sentence, a man who was *not eligible* for the death sentence under the Constitution, as interpreted by the United States Supreme Court, would have been executed by the State of Arkansas on Wednesday, September 22, 1993. That is a chilling and sobering thought.

Mr. Fairchild is not retarded, as any objective person would agree who reviewed the extensive evidence on his mental status. *See*

*Fairchild v. Lockhart,* 744 F.Supp. 1429 (E.D.Ark.1989). Mr. Fairchild's confessions were given voluntarily and the truth of the essential facts stated in those confessions cannot be doubted by any fair and objective person. He is guilty of capital murder because he participated in kidnapping Ms. Mason, because he raped her and robbed her and because his confederate murdered her under circumstances manifesting extreme indifference to the value of human life.

Many people might believe that the death penalty would be appropriate under these circumstances. But the law is otherwise. And most people would probably agree that no one should be executed contrary to the law and our Constitution. And yet, that is what almost happened here because the law left it up to Mr. Fairchild to decide whether he lived or died. That law should be revisited.