IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-37,034-02






EX PARTE STEVEN KENNETH STALEY, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM TARRANT COUNTY COUNTY






 Per Curiam. Price, J., filed a dissenting statement. Womack, J., dissented.


ORDER



 Pursuant to the provisions of Article 11.071 of the Texas Code of Criminal Procedure,
applicant filed an application for writ of habeas corpus seeking relief from his death sentence. We
have reviewed that application and conclude that it must be dismissed as a subsequent application
that does not satisfy the requirements of Section 5(a)(1) of Article 11.071; thus, consideration of the
merits of applicant's claim is barred.

I.


 In January 1991, applicant was convicted of the capital murder of Robert Read during a
robbery in Tarrant County. Based upon the jury's responses to four special issues, the trial judge
sentenced him to death. His conviction was affirmed on direct appeal. Staley v. State, 887 S.W.2d
885 (Tex. Crim. App. 1995). Applicant's writ of certiorari to the Supreme Court on direct appeal
was denied on March 20, 1995. Staley v. Texas, 514 U.S. 1020 (1995). He then filed his original
application for a writ of habeas corpus with the convicting court on October 14, 1997, and this Court 
denied relief on September 16, 1998. Ex parte Staley, No. 37,034-01 (Tex. Crim. App. Sept. 16,
1998) (not designated for publication). Applicant's request for federal habeas corpus relief was
denied by the federal district court on September 19, 2003. Staley v. Dretke, No. 4:99-CV-186-Y
(N.D. Tex. Sept. 19, 2003). The trial court set applicant's execution date for March 23, 2005. On
March 22, 2005, one day before that scheduled execution, this Court received a second, subsequent
writ application. (1) We granted applicant's motion for a stay of execution so that we would have
sufficient time to determine whether his current Penry claim meets the requirements of Section
5(a)(1) of Article 11.071.

 II.


 Applicant's trial took place in April 1991. In June 1989, the United States Supreme Court
had delivered its opinion in Penry v. Lynaugh (Penry I). (2) Penry I held that, although the Texas
statutory special issues are a facially constitutional and sufficient framework for death-penalty
punishment decisions, those special issues may sometimes be insufficient to protect a defendant's
right to have the jury consider and give effect to certain types of mitigating evidence. (3)

 The 1989 Penry I decision created a dilemma for Texas trial courts in capital-murder cases.
As the Fifth Circuit has noted, Texas trial courts "could not craft entirely new jury interrogatories,
as the precise questions had been written by the state legislature. Nor could they suspend the trials
in anticipation of legislative remediation, as the legislature would not meet again until 1991 and its
reaction was unknown." (4) Thus, Texas state courts attempted to provide timely trials that complied
with Penry I by drafting extra-statutory jury instructions or supplemental special issues until the
Texas Legislature enacted a statutory mitigation special issue which went into effect on September
1, 1991. (5) 

 In this particular case, the trial judge submitted to the jury a fourth special issue, styled "the
Question," during the punishment phase which read:

 Do you find from the evidence beyond a reasonable doubt, after considering
all mitigating evidence, if any there be, and considering the defendant's level of
culpability, character and background and the circumstances of the offense, that the
penalty of death is the appropriate punishment?

 In your verdict, you will answer "Yes" or "No."


 ANSWER: _______________.


On the page before the Question, the trial court had instructed the jury that


 "Mitigating evidence" may be evidence about any aspect of the defendant's
background, character or the circumstances of the crime of which you have convicted
the defendant, which you believe makes the penalty of death inappropriate. Under
our law mitigating factors are not set out or limited by law.

 If there is mitigating evidence, you must consider such evidence and decide
how much weight to give any such evidence. You are the sole judges of how much
weight any such evidence, if any, deserves.

 Therefore, in light of the foregoing instructions, if evidence has been
presented to you by either side in mitigation of the death penalty, and after
considering such evidence, if any there be, you are not persuaded beyond a
reasonable doubt that death is the appropriate sentence, you will answer the following
question "No." If you are persuaded beyond a reasonable doubt that death is the
appropriate sentence, you will answer the following question "Yes." If you have a
reasonable doubt as to whether the question should be answered "No" or "Yes," you
must resolve the matter in favor of the defendant and answer the question "No."


 Earlier in the punishment charge, in reference to the statutory special issues, the trial court
had instructed the jury:

 During your deliberations you shall consider mitigating circumstances, if any,
presented by either party, that was [sic] admitted for your consideration in both
phases of the trial.

 A mitigating circumstance may be any aspect of the defendant's character,
background or the circumstances of the crime for which you have found the
defendant guilty, which you believe makes a sentence of confinement for life
appropriate.


Thus, the trial judge instructed the jury to consider mitigating circumstances both as those
circumstances might apply to the answers to the three statutorily authorized special issues and, with
a lengthier definition and greater explanation, to the extra, non-statutory Question. These
instructions and the Question required the State to prove beyond a reasonable doubt that there were
insufficient mitigating circumstances to call for a sentence of life imprisonment. (6)

 The jurors in applicant's case answered the Question "Yes." They unanimously found,
beyond a reasonable doubt, that, even considering all of the mitigating evidence and applicant's level
of culpability, "the penalty of death is the appropriate punishment."

 Applicant's concern, however, is not with the mitigation instructions or the Question per se. 
Rather, his claim deals with the judge's instructions concerning what the jury should do if it had
answered the Question "No," finding that it was not convinced, beyond a reasonable doubt, that the
penalty of death was the appropriate punishment. Under the answer line for the Question , the trial
judge included the following instruction, which applied only if the jury answered the Question 
"No":

 If you have answered the foregoing question "No," you are instructed to draw a single
line through the word "Yes" which you have previously written as your answer to
Special Issue No. 1, and to answer Special Issue No. 1, "No."


That is, if the jury had found, based on the mitigating evidence and applicant's level of culpability,
that the death penalty was not the appropriate sentence, then it should go back to the "future
dangerousness" special issue, cross out its original answer of "Yes" and instead answer that issue
with a "No." (7) 


 On the preceding page of the jury instructions, immediately before the Question, the jury was
also instructed that if it could not answer the Question, (8) it should leave the answer line blank, and
it should also "draw a single line through the word 'Yes' which you have previously written on your
verdict form for Special Issue No. 1, leaving no answer for Special Issue No. 1." That is, if the jury
could not answer the Question, it should return to the first special issue and cross out its "Yes"
answer to that special issue. Although the jury was not informed of the effect of crossing out its
answer to the first special issue, under article 37.071 the legal effect was that the defendant would
be sentenced to life imprisonment, not death. (9) However, because the jury unanimously found that,
despite its consideration of the mitigating evidence and applicant's level of culpability, "the penalty
of death was the appropriate punishment," it never reached any issue of crossing out the "Yes"
answer to the first special issue.

 On direct appeal, applicant raised a Penry I claim and argued that the jury was not provided
with "a proper jury instruction on how to apply mitigating evidence offered during trial[.]" (10) At trial,
however, it was the State, not applicant, who objected to the submission of the Question and the
accompanying instructions. (11) Applicant's "only objection to the charge as given was a general
objection to the constitutionality of Article 37.071." (12) Applicant now contends that the Question and
the instructions to the jury as to what it should do if it answered the Question "No," compelled the
jurors "to act dishonestly in order to give effect to mitigating evidence."

 Neither we nor the trial court can consider the merits of that claim unless we first find that
applicant's current application "contains sufficient specific facts establishing" that his claim is both
cognizable under current constitutional law and was legally "unavailable" at the time he filed his
original writ. Therefore, we turn to that question. 

III.


 Section 5 of Article 11.071 of the Code of Criminal Procedure statutorily controls the
authority of Texas state courts to consider new claims raised on any subsequent writ of habeas
corpus in a death-penalty case. It states, in pertinent part:

 (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial
application, a court may not consider the merits of or grant relief based on the
subsequent application unless the application contains sufficient specific facts
establishing that:

 (1) the current claims and issues have not been and could not have been
presented previously in a timely initial application or in a previously
considered application filed under this article or Article 11.07 because the
factual or legal basis for the claim was unavailable on the date the applicant
filed the previous application;

 ...

 d) For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or
before a date described by Subsection (a)(1) if the legal basis was not recognized by
or could not have been reasonably formulated from a final decision of the United
States Supreme Court, a court of appeals of the United States, or a court of appellate
jurisdiction of this state on or before that date.


 Under this legislative enactment, no Texas court is permitted to consider the merits of a
subsequent writ claim unless the legal basis for that claim was "unavailable" at the time the applicant
filed his original writ application. Section 5(d) defines an unavailable claim as one whose legal basis
had not been "recognized by" or could not be "reasonably formulated from" a decision by the
Supreme Court, the federal circuit courts, or this Court on the date the original (or any other
previously considered) habeas writ application was filed in the convicting court. Thus, if applicant
could have "reasonably formulated" his present claim from Supreme Court, federal circuit court, or
this Court's precedent that existed when he filed his original writ application in 1997, we are barred,
under Texas statutory procedures, from considering that claim in a subsequent writ. 

 Applicant claims that the punishment-phase jury instructions in his case were the functional
equivalent of the constitutionally defective nullification instructions given in Penry v. Johnson
(Penry II), (13) Tennard v. Dretke, (14) and Smith v. Texas. (15) Applicant further asserts that these three
Supreme Court decisions set out a new rule of law, and, therefore, his present claim was
"unavailable" at the time he filed his initial habeas application. It was not until "[t]hese cases
expressly held that the state and federal courts in Texas have repeatedly applied an improper legal
standard in assessing Penry claims" that his claim concerning the Question and its jury instructions
became available. He relies upon this Court's recent remand order in Ex parte Robertson (16) as
support for his contention that he could not have formulated his present legal claim until this trio of
cases was delivered by the United States Supreme Court. 

 The State, on the other hand, argues that applicant's claim is procedurally barred because the
legal basis for that claim was "available" at the time he filed his first writ application in 1997. The
State notes that, in fact, applicant did raise a Penry jury-charge claim in his direct appeal and it was
rejected. (17) The State argues that, because applicant was able to recognize and raise a Penry claim
on direct appeal in 1994, he cannot now complain that his claim was "unavailable" when he filed
his first writ in 1997. (18) 

 The State also contends that, even if applicant's claim is considerably more narrow-"that the
mitigation issue contained a prohibited nullification instruction in violation of Penry II"-that specific
claim was also available before applicant filed his 1997 writ application. The State cites cases from
this Court in which that issue had been raised by other capital-murder defendants in 1993 and 1994. (19) 
Accordingly, argues the State, "[w]here the basis of a constitutional claim is available, and other
defense counsel have perceived and litigated that claim, the demands of comity and finality counsel
against labeling alleged unawareness of the objection as cause for a procedural default." (20) 

 We need not, however, decide whether applicant's claim was legally available at the time he
filed his original writ because we conclude that his application does not "contain sufficient specific
facts establishing that" his claim is cognizable even if Penry II, Tennard, and Smith created a new
and previously unavailable legal claim. 

 Under both Article 11.07 and Article 11.071, an original or subsequent application for a writ
of habeas corpus must state specific, particularized facts which, if proven true, would entitle him to
habeas relief. (21) These facts must be sufficient to enable a court to determine, from the face of the
application itself, whether the application merits further inquiry. That is, the facts must establish a
cognizable claim based on formerly "unavailable law." Thus, it is not sufficient to allege that a legal
claim was unavailable at the time of the applicant's original filing if the facts alleged in the
subsequent applicant do not bring the constitutional claim under the umbrella of that "new" legal
claim. For example, Ring (22) and Apprendi (23) may have been delivered after a death-row inmate had
filed his original writs. That law was unavailable at the time of the original filing, but we have
already held that Ring and Apprendi do not require the State, in a death-penalty case, to bear the
burden of proving beyond a reasonable doubt that the mitigation issue should be answered in the
negative. (24) Thus, a subsequent writ based upon a Ring or Apprendi claim alleging that the State
failed to disprove the mitigation issue beyond a reasonable doubt does not contain "sufficient
specific facts establishing" a cognizable constitutional claim based upon formerly "unavailable" law. 
 Similarly, a death-row inmate may file a subsequent writ application based upon the newly available
legal claim of mental retardation under Atkins v. Virginia, (25) but if his application states that his I.Q.
has repeatedly been tested at 120-130, he has failed to state sufficient specific facts establishing a
cognizable claim under Atkins. We turn, then, to the question of whether the specific facts alleged
in applicant's subsequent writ-the wording of the punishment jury charge-establish a cognizable
constitutional claim based on formerly "unavailable" law. 

 The jury charge in applicant's trial, unlike the jury instructions in Penry II, Tennard, and
Smith , contained a fourth special issue, the Question, which focused exclusively upon mitigating
evidence. In this case, the jury was specifically asked whether the mitigating evidence and jury's
assessment of applicant's moral culpability raised any reasonable doubt as to whether the death
penalty was the appropriate punishment. Here, before the jury could ever even consider any
"nullification" action, it was asked an affirmative, highly focused question: After considering any
and all mitigating evidence and the applicant's level of culpability, his character, background, and
the circumstances of the offense, is the penalty of death the appropriate punishment? With its "Yes"
answer, the jury unanimously found, beyond a reasonable doubt, that death was the appropriate
penalty. This jury, therefore, was clearly and unequivocally capable of giving effect to mitigating
evidence in its answer to the Question. The "nullification" problem identified in Penry II never
came into play because the jury had already explicitly found that, regardless of any and all mitigating
evidence, death was the appropriate punishment. In Penry II, the Supreme Court held that "the key
under Penry I is that the jury be able to 'consider and give effect to [a defendant's mitigating]
evidence in imposing sentence.'" (26) In Penry II, the Supreme Court disapproved of an instruction
that the jury simply "nullify" special issues within a verdict form rather than specifically consider
mitigation evidence on its own merits. (27)

 That problem simply does not exist in this case. Although the constitutional concerns set out
in Penry II could have arisen in this case had the jury answered the Question with "No," it did not
do so. Any claim that the jurors would have faced a dilemma in answering the first special issue
"falsely" simply to give effect to applicant's mitigating evidence never arose. There is no reasonable
likelihood that the jury in this particular case was, in fact, faced with the dilemma denounced in
Penry II, Tennard, or Smith.

 A habeas applicant cannot establish a constitutional violation simply by demonstrating that
an allegedly erroneous jury instruction could have or might have affected some hypothetical jury. 
As the Supreme Court explained in Boyde v. California: (29)

 We think the proper inquiry in such a case is whether there is a reasonable likelihood
that the jury has applied the challenged instruction in a way that prevents the
consideration of constitutionally relevant evidence. Although a defendant need not
establish that the jury was more likely than not to have been impermissibly inhibited
by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth
Amendment if there is only a possibility of such an inhibition. This "reasonable
likelihood" standard, we think, better accommodates the concerns of finality and
accuracy than does a standard which makes the inquiry dependent on how a single
hypothetical "reasonable" juror could or might have interpreted the instruction. ...
Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of
meaning in the same way that lawyers might. Differences among them in
interpretation of instructions may be thrashed out in the deliberative process, with
commonsense understanding of the instructions in the light of all that has taken place
at the trial likely to prevail over technical hairsplitting. (30)


 The simple, commonsense understanding of the Question and the jury's unanimous "Yes"
response to the Question compel us to conclude that the jury could and did have an adequate vehicle
to express its consideration of applicant's mitigating evidence. Only if we could conclude that a
reasonable jury would have falsely answered the fourth special issue with a "Yes" response-even
though it had found that the mitigating evidence raised a reasonable doubt that the death penalty was
the appropriate punishment-because it was unwilling to "falsely" change its answer to the first
special issue could we conclude that this special issue and the accompanying instructions are covered
by and possibly infirm under Penry II, Tennard, and Smith. 

 Therefore, we hold that, as a matter of Texas statutory law, this subsequent application does
not contain "sufficient specific facts" that establish that applicant's current claim is cognizable under
the Penry II, Tennard, and Smith line of cases even if we were to decide that this trio of cases created
a new legal claim that was unavailable on the date applicant filed his previous writ application. (31) 
Under Texas statutory law, we are barred from considering the merits of applicant's subsequent
writ. (32)

 We therefore dismiss the present application for a writ of habeas corpus under Article 11.071,
§ 5(a)(1), and lift the stay of execution previously entered by this Court on March 23, 2005.

 It is so ORDERED on this the 27th day of April, 2005.


Publish


 
1. This Court does not condone the filing of eleventh hour writs or motions in any case, much less death-penalty cases in which the stakes are so high, absent a showing of good cause. We will not reject a death-row
inmate's last-minute application merely because it is untimely, but we will not hesitate to reject it expeditiously if we
conclude that it is frivolous or filed solely as an attempt to delay. 
2. 492 U.S. 302 (1989). 
3. Id. at 315-17, 328.
4. Robertson v. Cockrell, 325 F.3d 243, 248 (5th Cir.)(en banc), cert. denied, 539 U.S. 979 (2003); see also
State v. McPherson, 851 S.W.2d 846, 849-50 (Tex. Crim. App. 1992) (noting that this Court had "grappled with the
application of Penry" for some time; upholding the submission of an extra-statutory special mitigation issue).
5. See Robertson, 325 F.3d at 249 (noting that "dozens" of capital-murder trials were conducted during this
"hiatus" using extra-statutory Penry I instructions).
6. These instructions and the extra-statutory special issue were considerably more favorable toward applicant
than current Texas law requires. 

 First, the current statute, Tex. Code Crim. Proc. art. 37.071, § 2(d)(1), requires jurors to be instructed that,
in answering the "future dangerousness" and "anti-parties" special issues, they shall consider all evidence admitted at
the guilt stage and the punishment stage, including evidence of the defendant's background or character or the
circumstances of the offense that militates for or mitigates against the imposition of the death penalty. The jury in
this case was not instructed that it must consider evidence about the defendant's background or character that
"militates for" the death penalty. It was told only that it must consider "mitigating circumstances" about the
defendant's character, background or circumstances of the crime.

 Second, the jury was explicitly required to find, beyond a reasonable doubt, that, even after considering all
mitigating evidence and applicant's level of culpability, the penalty of death was still the "appropriate punishment." 
The jury was informed that any reasonable doubt must be resolved in applicant's favor. Under current law, Tex.
Code Crim. Proc. art. 37.071, § 2(e)(1), the State has no burden of proof, much less a burden of proof "beyond a
reasonable doubt," to disprove the mitigation value of evidence. 
7. This methodology was intended to ensure that both Penry I and Texas statutory law were followed. The
Texas statute, at that time, allowed for only three special issues. The death penalty was or was not imposed based
upon the answers to those-and only those-special issues. Tex. Code Crim. Proc. Art. 37.071 (Vernon 1990). 
Under the Texas law then in effect, the trial judge "shall submit the following three issues to the jury"-those being
the "deliberateness," "future dangerousness," and, if raised by the evidence, "provocation" special issues. Id. art.
37.071(b). The State was required to prove each issue beyond a reasonable doubt, and the jury "shall return a
special verdict of 'yes' or 'no' on each issue submitted." Id. art. 37.071(c). Then, "[i]f the jury returns an
affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death." Id.
art. 37.071(e). Thus, under then-existing Texas law, if the jury answered each of the statutorily required special
issues affirmatively, the trial judge was required to sentence the defendant to death, regardless of whatever other,
extra-statutory issues or questions might also be submitted to the jury. The sentence in a capital-murder case
depended solely upon the answers to those three statutorily required special issues. See Stewart v. State, 686 S.W.2d
118, 124 (Tex. Crim. App. 1984) (stating that "[o]ther than the provisions in Article 37.071, V.A.C.C.P., Texas
jurisprudence has no authority allowing the submission of special issues to a jury in a criminal case"). Thus, any judicial efforts to comply with the Supreme Court mandate in Penry I also had to comply with the
legislatively mandated procedure set out in article 37.071. Both the convoluted instructions rejected in Penry II and
the present trial court's submission of the extra-statutory Question, coupled with an instruction to change a "Yes"
answer to the first special issue to a "No" if the jury had answered the Question "No," were judicial attempts to
comply with Texas statutory mandates as well as constitutional standards. See generally, State v. McPherson, 851
S.W.2d 846 (Tex. Crim. App. 1992). In McPherson, this Court upheld the imposition of a life sentence when the
jury in a capital-murder punishment stage answered the fourth, extra-statutory, special issue "No," reasoning that the
Supremacy Clause required that the mandate of Penry I take precedence over the possible conflict with Texas
statutory requirements. McPherson, 851 S.W.2d at 850. Judge Clinton, in his concurring opinion in McPherson,
cogently set out the dilemma facing Texas judges at that time:

 After Penry, failure of a trial court to inform the jury that it could consider and give effect
to mitigating circumstances violates rights of defendant under the Eighth Amendment and renders
our capital punishment scheme mandated by former Article 37.071 unconstitutional. ...

 The judge of the court below manifested his understanding and appreciation of the
situation when he caused the court to give the instruction and to submit the fourth special issue to
the jury. And ... the trial judge also understood and appreciated the dilemma thus created by
affirmative answers to statutory issues and the negative answer to the constitutional issue: on one
horn, the statutory mandate that the trial court sentence appellant to death because the jury returned
an affirmative finding on each of the only three legislatively prescribed special issues; on the other
horn, the absence of an explicit statutory mandate to implement the implicit constitutional dictate
that bars the State of Texas from executing appellant because the jury returned a negative finding
on special issue four, i.e., that the death penalty is not a reasoned moral response to mitigating
evidence favoring appellant.

Id. at 853 (Clinton, J., concurring).
8. The jurors were instructed that they must be unanimous to answer the mitigation Question "Yes" and that
at least ten jurors had to agree before they could answer the Question "No." If, after due deliberation, they could do
neither, then they were not to answer the Question at all.
9. Tex. Code Crim. Proc. Art. 37.071(e) (Vernon 1990) ("If the jury returns a negative finding on or is
unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the
Texas Department of Corrections for life"). The statute addresses only the effect of answers to the statutory special
issues "submitted under this article."
10. Staley v. State, 887 S.W.2d 885, 897 (Tex. Crim. App. 1994). 
11. Id. at 895 & n.9.
12. Id.
13. 532 U.S. 782 (2001). 
14. 542 U.S. ___, 124 S.Ct. 2562 (2004).
15. ___ U.S. __ , 125 S.Ct. 400 (2004).
16. Ex parte Robertson, AP-74,720, slip op. at 2 (Tex. Crim. App., March 16, 2005) (not designated for
publication).
17. Staley, 887 S.W.2d at 897.
18. For this argument, the State relies upon Selvage v. Collins, 975 F.2d 131, 133 (5th Cir. 1992) ("we have
held that the unsuccessful advancement of Penry claims by defense counsel as early as 1980 demonstrates that such
claims were reasonably available at that time").
19. See Coble v. State, 871 S.W.2d 192, 207 & n.18 (Tex. Crim. App. 1993) (rejecting defendant's claim
that "nullification" jury instruction did not provide an adequate means to give effect to mitigating evidence and
noting that defendant had objected to instruction "claiming it shifted the burden of proof to appellant to establish
mitigating evidence, it was confusing and did not give the jury a clear means to give mitigating effect to any
mitigating circumstances, and it violated the jury's oath to answer the special issues truthfully"); Robertson v. State,
871 S.W.2d 701, 710-11 (Tex. Crim. App. 1993) ( rejecting defendant's contention that "nullification" instruction
was insufficient vehicle to avoid the constitutional infirmity in Penry); see also Bigby v. State, 892 S.W.2d 864, 890
(Tex. Crim. App. 1994) (rejecting defendant's claim that "nullification" instruction did not satisfy commands of
Penry); Wheatfall v. State, 882 S.W.2d 829, 840-41 (Tex. Crim. App. 1994) (rejecting defendant's claim that
"nullification" instruction "calls for the jurors to act against their natural inclinations by asking them to alter one of
their answers to the special issues").
20. Engle v. Isaac, 456 U.S.107, 134 (1982); see also Smith v. Murray, 477 U.S. 527, 536-37 (1986)
(rejecting applicant's contention that he was entitled to rely on the novelty of his constitutional claim as a sufficient
cause for his failure to raise that issue in his direct appeal; stating that "the question is not whether subsequent legal
developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all"
and noting that "various forms of the claim he now advances" had been percolating in lower courts for years before
the time of procedural default).
21. See Ex parte Sowell, 956 S.W.2d 39, 40 (Tex. Crim. App. 1997) (per curiam) (consideration of merits of
subsequent writ filed under art. 11.07 barred when applicant failed to include "sufficient specific facts establishing"
one of the exceptions to § 4).
22. Ring v. Arizona, 536 U.S. 584 (2002).
23. Apprendi v. New Jersey, 530 U.S. 466 (2000).
24. Paredes v. State, 129 S.W.3d 530, 541 (Tex. Crim. App. 2004); Resendiz v. State, 112 S.W.3d 541, 550
(Tex. Crim. App. 2003).
25. 536 U.S. 304 (2002).
26. Penry II, 532 U.S. at 797 (quoting Penry I, 492 U.S. at 319).
27. In Penry II, the Supreme Court stated:

 We generally presume that jurors follow their instructions. Here, however, it would have been both
logically and ethically impossible for a juror to follow both sets of instructions. Because Penry's
mitigating evidence did not fit within the scope of the special issues, answering those issues in the
manner prescribed on the verdict form necessarily meant ignoring the command of the
supplemental instruction. And answering the special issues in the mode prescribed by the
supplemental instruction necessarily meant ignoring the verdict form instructions. Indeed, jurors
who wanted to answer one of the special issues falsely to give effect to the mitigating evidence
would have had to violate their oath to render a "true verdict." 

 The mechanism created by the supplemental instruction thus inserted "an element of
capriciousness" into the sentencing decision, "making the jurors' power to avoid the death penalty
dependent on their willingness" to elevate the supplemental instruction over the verdict form
instructions. There is, at the very least, "a reasonable likelihood that the jury ... applied the
challenged instruction in a way that prevented the consideration" of Penry's mental retardation and
childhood abuse. The supplemental instruction therefore provided an inadequate vehicle for the
jury to make a reasoned moral response to Penry's mitigating evidence. (28)
28. Id. at 799-800 (citations omitted). - 
29. 494 U.S. 370 (1990).
30. Id. at 380-81.
31. Tex. Code Crim. Proc. art. 11.071, § 5(a)(1).
32. We also need not address the question of whether, under Texas state law, applicant procedurally
defaulted this claim by failing to make a contemporaneous objection in the trial court to the "nullification"
instructions accompanying the Question. See, e.g., Ex parte Smith, 132 S.W.3d 407, 423-24 (Tex. Crim. App. 2004)
(Hervey, J., concurring) and id. at 428 (Holcomb, J., concurring), rev'd on other grounds sub nom Smith v. Texas,
___ U.S. __, 125 S. Ct. 400 (2004).